**STATE of Minnesota, Respondent,**

**v.**

**Kendall Keith BLISS, Appellant.**

**No. C5–88–1937.**

Supreme Court of Minnesota.

July 6, 1990.

---

John Stuart, State Public Defender, Susan L.–P. Hauge, Asst. State Public Defender, Minneapolis, and Kendall Keith Bliss, Stillwater, for appellant.

Hubert H. Humphrey, III, Atty. Gen., Paul R. Kempainen, Asst. State Atty. Gen., St. Paul, and John Carlson, Pine County Atty., Pine City, for respondent.

POPOVICH, Chief Justice.

Defendant Kendall Keith Bliss was convicted by a Pine County jury for the first degree premeditated murder of John Lake on August 1, 1986. Defendant argues the evidence is not sufficient to sustain his conviction. He also claims he is entitled to postconviction relief because of newly discovered evidence, and raises the pro se issues of ineffective assistance of counsel

and violation of the confrontation clause. We affirm both defendant's conviction and the denial of postconviction relief.

## I.

During March 1986, defendant was living in Jerry Wiggins' house in Duluth. John Lake, Wiggins' friend, also lived in Duluth. In March 1986, defendant, Lake, and Wiggins were arrested and jailed for a burglary in Wisconsin. In early June 1986, Gerald Moore moved from Chaska to Duluth. Moore met Pat Ruskell, Lake's girlfriend, and shortly thereafter Ruskell moved out of the apartment she had shared with Lake, who was in jail, and moved in with Moore. In early July 1986, Lake was released and was upset about Ruskell's living with Moore. Moore and Lake's relationship improved by the end of July in part because Moore helped Lake move into the Wiggins house. Defendant moved back into the Wiggins house in July 1986 when he was released from jail.

Lake had several guns, including a Harrington & Richardson .22 pistol. Lake also brought Carole Bakke's .410 pump shotgun in for repair on February 4, 1986, but Bakke never saw the shotgun again. When Lake was arrested in March 1986, his guns, including a .22 caliber pistol, were put in Bakke's Suburban vehicle, from which they were subsequently taken into the Wiggins house.

Gwen Wiggins took care of several dogs during the summer of 1986, including Bakke's black labrador puppy, which was not housebroken and was causing damage to the Wiggins house. Defendant and Moore agreed to dispose of the dog for Gwen. About the end of July, 1986, defendant and Moore drove to the Dago Lake area in Pine County to fish and to dig a grave for the dog. About 200 feet off the entrance road, they dug a grave about four and one-half feet deep, five feet long, and three feet wide.

Defendant and Moore planned a trip from Duluth to Shakopee to repossess a yellow 1973 Ford station wagon Moore had sold to someone who was not making the payments and also to dispose of Bakke's dog. On August 1, Moore and Ruskell drove to the Wiggins house to pick up defendant and the dog. Defendant took two guns from the Wiggins house, placing a shotgun in Moore's back seat and a .22 pistol in the trunk. At the last minute Lake was asked to join Moore and defendant. Ruskell looked after the Wiggins children while Gwen Wiggins and Bakke went shopping. Leaving Duluth between 4:00 and 4:30 p.m., Moore drove his car, with defendant riding in the front passenger seat and Lake in back with the dog. Ruskell remembered seeing Lake and defendant leave in Moore's car.

Moore testified that Lake and defendant argued during the trip. Moore drove to the Dago Lake site where defendant and Moore had dug the grave for the dog. Lake and defendant got out of the car. Lake placed his belt around the dog's collar and defendant loaded the shotgun and walked to the woods behind Lake and the dog. Moore trailed some distance behind defendant. About 80–90 feet from the car Lake turned the dog loose. Defendant fired one shot at the dog, but Moore did not see whether it was hit. Defendant then turned the shotgun on Lake and said, "Bye, pal." Lake responded, "No. Don't, Ken, don't." From a distance of about 20–25 feet, defendant fired three shotgun rounds at Lake's face. Lake put his hands up to protect himself, but fell to the ground after being hit. Defendant then instructed Moore to return to the car and get the pistol from the trunk. Moore was terrified and obeyed. Moore returned from the car with the pistol and handed it to defendant. They returned to Lake, who was still alive, lying face up on the ground. Defendant shot Lake seven times with the pistol, primarily in the head, then reloaded the pistol and fired an eighth shot into Lake's body.

As defendant instructed, Moore grabbed Lake's arm and leg and helped drag him about 80 feet to the grave that had been dug for the dog. Defendant removed Lake's wallet, took the money from it, and replaced it in a back pants pocket. Moore then, as directed, pushed Lake's body into the grave. The body ended up lying on its

side. Defendant threw a dog collar and a leash into the grave. Moore hesitated when defendant ordered him to push dirt into the grave, thinking he might end up in the grave with Lake, but he helped cover the body. Defendant returned to the spot where Lake was shot and picked up the spent shells. Defendant put the shotgun in Moore's back seat and kept the pistol in front with him. When they reached Willow River, defendant directed Moore to stop the car and got out and threw the pistol into the river.

Defendant and Moore then continued their trip to Shakopee. Defendant threatened to kill Moore and his girlfriend, Ruskell, if Moore told anybody about the murder, and said he had killed two or three other people in the past who had been involved in crimes with him. If they were asked, defendant directed Moore to say Lake had an argument with them and jumped out of the car in the Twin Cities. They reached Shakopee about 10:30 p.m., located Moore's yellow Ford station wagon, and started it with a screwdriver. Defendant drove the station wagon back to Duluth. The car was reported to police as stolen on August 1.

Both defendant and Moore returned to the Wiggins house late on the night of August 1. Ruskell recalled asking them where Lake was and being told he had been dropped off in the Twin Cities. Early on August 2nd, Bakke saw a yellow station wagon she had never seen before outside the Wiggins house and did not recall seeing her dog in August. Numerous witnesses testified Lake disappeared on or about August 1, 1986, with various explanations for his disappearance.

Moore testified his fear of defendant and the shock from witnessing Lake's murder lasted for over one year. During this period Moore told no one what had happened. In late August or early September 1987, after hearing defendant was getting out of jail and feeling he could not live with his conscience any longer, Moore decided to talk to his friend, Edina police officer Ronald Mundale. At first Moore was nervous and fearful, but eventually he related most of the facts to Mundale. After independently learning that Lake was missing, Mundale felt duty-bound to report Moore's story. On October 21, 1987, Edina police detective Don Enger met with Moore and Mundale to discuss Moore's story. Neither Mundale nor anyone else ever promised Moore immunity.

On October 22, 1987, Enger, Mundale, and Moore met with members of the Pine County sheriff's office at the murder site. The first day of searching for the grave yielded no results. Moore pointed out the Willow River location where defendant discarded the pistol, and on October 23 investigators recovered a .22 Harrington & Richardson pistol. Moore identified it as the murder weapon. On October 26, Moore directed police to the grave. When what appeared to be a short-sleeved shirt was uncovered, digging was stopped and the Bureau of Criminal Apprehension ("BCA") was called.

After a BCA crime lab unit arrived, the exhumation continued. A BCA investigator photographed and videotaped the exhumation, and Enger also took photographs. The photos and video were shown to the jury. The debris and dirt removed from the grave was sifted through screens in search of evidence. A belt attached to a dog's choke-chain collar, a hat band, feathers, straw, a fingernail, a pack of generic cigarettes, and a used cigarette filter were unearthed. A digital watch was on Lake's left arm and a billfold fell out of his pants pocket as his body was lifted from the grave. A sheet of plexiglass was used to lift the body from the grave in order to preserve it in the same (fetal) position. Investigators used a metal detector to check the area where Moore thought Lake was shot, but no metal firearm cartridges were found. According to a BCA investigator, Thomas Erson, the exhumation and investigation of the site followed proper procedures.

When the Harrington & Richardson .22 caliber rim fire revolver was recovered from the Willow River, there was one spent round under the hammer and the other six chambers had live rounds. The revolver

was built to shoot seven times, which is uncommon. A BCA expert cleaned the rusty pistol and found it misfired when tested. The revolver could not be eliminated as the weapon that fired the bullets recovered from Lake's body. The bullet fragments were consistent with .22–caliber rim-fire long-rifle bullets. A fingerprint expert found no fingerprints on the revolver because of the length of time it spent in the water.

Dr. Susan Roe performed an autopsy on the body. Since it was badly decomposed she was unable to pinpoint the time of death, but opined the condition of the body was consistent with death about August 1, 1986. Both arms, the jawbone, and a spinal bone were fractured. Dr. Roe detected bullet fragments in the head, neck, both arms, and the spinal cord. Shot was located in the esophagus, right eye, and stomach. While the shotgun wounds would not have been immediately fatal, the coroner believed the other bullet wounds caused death nearly immediately. The cause of death was "traumatic injuries to the head and neck due to the gunshot wounds and the shotgun wounds to the head and neck." During the autopsy a portion of the decedent's right hand was removed and a BCA fingerprint expert positively identified the thumbprint as that of John Lake.

On October 27, 1987, defendant was arrested for John Lake's murder. He was told Lake's body had been found in Pine County, but defendant said he did not know the location of Pine County, Hinckley, or Willow River. Defendant then gave a taped statement to police. In this statement he said he "vaguely" knew Lake and maintained the last time he saw Lake was July 4, 1986. Defendant denied killing Lake. Although defendant admitted making a trip with Moore to repossess a car, he denied that Lake was with them that day. In addition, he denied possessing a .22 revolver like the one found in the Willow River. Defendant also said he had never been involved with Gwen Wiggins.

A Pine County grand jury indicted defendant for the first degree murder of John Lake in violation of Minn.Stat. § 609.185(1)

(1986). On June 17, 1988, a Pine County jury convicted defendant of first degree murder. Defendant appealed to this court. On July 31, 1989, however, defendant moved for a stay of the appeal and a remand for postconviction proceedings because of newly discovered evidence. We granted that motion. On November 29, 1989, a postconviction hearing was held in Pine County District Court. The hearing centered on testimony by 16–year–old Jason Wiggins that he saw John Lake alive sometime in September or October 1986, after Lake's alleged August 1, 1986 murder.

Jason Wiggins testified that while coming home from school during the fall of 1986 he saw John Lake alive. Lake was wearing his usual hunting clothes, a hat, and a blue jacket. Lake told Jason life had been hard for him lately, and he missed Ruskell, Gwen Wiggins, and the Wiggins family. Jason placed this event because he had received information that day at school about a French camp he attended that fall. Jason testified at defendant's trial, but did not mention this sighting "[b]ecause I wasn't asked." Although Jason knew prior to trial that August 1, 1986 was the alleged murder date, he maintained he did not become fully aware of the significance of this date until after the trial. Jason, however, recalled telling interviewers about this sighting before trial, but he did not remember whom he told. According to Jason, he, his mother Gwen Wiggins, and others were playing cards shortly after the trial when Gwen mentioned the murder date and it began to dawn on Jason that seeing Lake alive after this date was significant. Nevertheless, Jason told no one in authority until his mother's report to defense investigator Ron Taggart more than a year after the trial.

Gwen Wiggins recalled Jason telling her twice about seeing Lake alive after August 1, 1986, once at the time of the sighting and once after the trial. Jason told Gwen that he and Lake played cards together at the Wiggins house after Lake's alleged disappearance. Gwen, however, did not relate this information to police during any of her pre-trial interviews because she "didn't

want to put my faith in my son." She thought Jason was not definite enough, could not be corroborated, and might have made a mistake. Gwen remembered Jason's sighting being discussed at a birthday party she held for Ruskell on September 5 or 6, 1986. Neither Ruskell nor anyone else testified to hearing Jason's sighting discussed. Jason liked both Lake and defendant but he would not lie for defendant, and he did not like and was afraid of Moore. Similarly, Gwen Wiggins had a romantic relationship with defendant, but did not like Moore.

Taggart conducted the pre-trial defense investigation, including interviewing Jason. Jason, in a pre-trial interview, did not tell Taggart he had seen Lake alive after August 1st. Although Taggart knew the state was maintaining Lake's murder occurred on August 1, 1986, he made no pre-trial inquiry whether Lake was seen alive after that date. In a post-trial interview, Jason told Taggart he had told interviewers "repeatedly" before trial about seeing Lake alive after August 1st. Jason also told Taggart that Lake had been with him at the Wiggins house.

The state's investigators interviewed Jason three times prior to his trial testimony. Neither Jason nor anyone else told these investigators about seeing Lake alive after August 1, 1986. The investigators were aware of the significance of August 1, 1986, and if anyone had told them Lake was seen alive after that date they would have followed up.

On March 2, 1990, the postconviction court denied defendant's petition for postconviction relief. The court ruled Jason Wiggins' testimony would not have affected the outcome of the trial because of the "overwhelming" evidence of defendant's guilt. Defendant reinstated the appeal of his conviction to this court and requested review of the postconviction court's decision.

## II.

Defendant argues the evidence was insufficient to sustain his conviction for first degree murder.

In reviewing a claim of sufficiency of the evidence, we must determine whether, under the facts in the record and any legitimate inferences that can be drawn from them, a jury could reasonably conclude that the defendant was guilty of the offense charged. The evidence must be viewed in the light most favorable to the prosecution * * *.

*State v. Ulvinen*, 313 N.W.2d 425, 428 (Minn.1981) (citation omitted). "If the jury acted with due regard for the presumption of innocence and the necessity of overcoming it with proof beyond a reasonable doubt, this court should not disturb its verdict." *State v. Underwood*, 281 N.W.2d 337, 340 (Minn.1979).

All the evidence surrounding the death—both before and after—is relevant to a determination of premeditation and intent. *See State v. Buchanan*, 431 N.W.2d 542, 547 (Minn.1988). If the jury believed Moore's testimony, there is no doubt defendant's actions constituted premeditated first degree murder. It is well established that a conviction can rest upon the testimony of a single credible witness. *State v. Williams*, 307 Minn. 191, 198, 239 N.W.2d 222, 226 (1976); *State v. Burch*, 284 Minn. 300, 313, 170 N.W.2d 543, 552 (1969). The weight and credibility of individual witnesses is for the jury to determine, *State v. Rainer*, 411 N.W.2d 490, 495 (Minn.1987), and on review "it is necessary to assume that the jury believed the state's witnesses and disbelieved any contrary evidence." *Ulvinen*, 313 N.W.2d at 428. Further, the jury is free to question a defendant's credibility based upon inconsistencies in his statement to police. *See State v. Race*, 383 N.W.2d 656, 662 (Minn.1986). The jury has no obligation to believe a defendant's story. By convicting defendant of first degree murder, the jury indicated it believed Moore's testimony and disbelieved defendant's statement to police.

In judging Moore's credibility, the jury could have taken several factors into consideration. Moore's two taped statements were read to the jury. Moore's consistency and detail on material facts surely enhanced his credibility. The bullet and

shot fragments in Lake's body, pieces of physical evidence in Lake's grave, and the .22 pistol found in the Willow River corroborated Moore's testimony. Ruskell saw defendant, Moore, and Lake leave together on August 1, 1986, but she saw only Moore and defendant return, and was told they dropped Lake off. Other witnesses and evidence corroborated Moore's testimony. In addition, Moore received no immunity for his testimony.

The jury also assessed defendant's credibility based upon the taped statement he gave to police, which was played for the jury. Defendant repeatedly said he last saw Lake on July 4, 1986. Ruskell, however, saw them leave together on August 1st. Defendant and Lake both lived in and were frequently present at the Wiggins house throughout July 1986. Even though defendant often visited land very close to the crime scene on Dago Lake, he denied knowing the location of Pine County or Willow River. Defendant's statement was contradicted in several other material ways.

Defendant, in effect, claims the jury should have believed his statement and disbelieved the testimony of Moore and others. The jury, however, received extensive evidence on Moore's credibility, the police investigation, and motive. Defendant's attempt to retry his case by asking us to reevaluate Moore's credibility is contrary to our role. *See State v. Darrow,* 287 Minn. 230, 235, 177 N.W.2d 778, 781 (1970). This court cannot retry the facts. *State v. Merrill,* 274 N.W.2d 99, 111 (Minn.1978). "The resolution of conflicting testimony is the *exclusive* function of the jury * * *." *State v. Lloyd,* 345 N.W.2d 240, 245 (Minn. 1984) (emphasis added). The jury reasonably believed Moore's testimony and disbelieved defendant's statement, and thus it reasonably found defendant guilty of first degree murder.

### III.

We next consider whether defendant is entitled to the postconviction relief of a new trial because of newly discovered evidence. A defendant seeking postconvic-

tion relief has the burden of establishing facts that warrant reopening the case. Minn.Stat. § 590.04, subd. 3 (1988). When the postconviction claim is newly discovered evidence:

> [T]he defendant must establish (1) that the evidence was not known to him or his counsel at the time of trial, (2) that his failure to learn of it before trial was not due to lack of diligence, (3) that the evidence is material (or, as we have sometimes said, is not impeaching, cumulative or doubtful), and (4) that the evidence will probably produce either an acquittal at a retrial or a result more favorable to the petitioner.

*Race v. State,* 417 N.W.2d 264, 266 (Minn. 1987); *see also* Minn.R.Crim.P. 26.04, subd. 1(1)5.

"The scope of our review in a postconviction proceeding is limited to the question of whether there is sufficient evidence to sustain the findings of the postconviction court." *Barness v. State,* 290 Minn. 509, 510, 187 N.W.2d 111, 112 (1971). A postconviction court's decision will not be disturbed except upon an abuse of discretion. *Berry v. State,* 364 N.W.2d 795, 796 (Minn. 1985). The postconviction court found the fourth criterion dispositive, holding Jason Wiggins' testimony would not have changed the outcome of the trial because of the "overwhelming" evidence of defendant's guilt, and impliedly finding Jason's testimony to be doubtful.

At least six people testified at trial that Lake disappeared approximately or exactly on August 1, 1986. Jason's sighting, however, is uncorroborated by any person or any physical evidence. Jason was 13 years old at the time of the alleged sighting, which was more than three years before the postconviction hearing. His memory of dates and events was not very good. Jason told Taggart that he "repeatedly" told investigators about this alleged sighting prior to trial, but none of Jason's interviewers remembered being told even once. Jason told his mother that he and Lake played cards at the Wiggins house, and Jason told Taggart that Lake came to the Wiggins house. Jason, however, testified inconsist-

ently at the hearing. Jason and Gwen Wiggins were friends of defendant, but did not like Moore. In sum, the jury reasonably believed Moore's trial testimony, which was corroborated in several respects, including the last date anyone saw John Lake alive. We deny defendant's petition for postconviction relief because the postconviction court did not abuse its discretion in finding that the postconviction testimony would not have changed the outcome at trial and that Jason's testimony was doubtful.

## IV.

■ Lastly, we examine defendant's pro se issues. Defendant argues he received ineffective assistance of counsel because his trial counsel called only two of the 14 witnesses defendant wanted called and because additional defense witnesses were not called at the postconviction hearing. An attorney provides effective representation if the attorney "exercise[s] the customary skills and diligence that a reasonably competent attorney would exercise under similar circumstances." *State v. Heinkel*, 322 N.W.2d 322, 326 (Minn.1982); *see also Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). Defendant has the burden of proving "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 688, 104 S.Ct. at 2064; *see also*

*Gates v. State*, 398 N.W.2d 558, 561 (Minn. 1987).

"Trial tactics, however, are not to be confused with competence." *Morgan v. State*, 384 N.W.2d 458, 460 (Minn.1986). Which witnesses to call and what evidence to present to the jury are matters of trial strategy, which are within the discretion of trial counsel. *State v. Jones*, 392 N.W.2d 224, 236 (Minn.1986). Defendant's claim also is factually suspect. After presenting two defense witnesses at trial, defendant specifically said in a discussion in chambers that he did not want to call any more witnesses.

■ Defendant also contends Gale Rachuy's postconviction testimony violated confrontation and equal protection principles because Rachuy testified over the telephone. The postconviction court, however, took this testimony subject to its later ruling on counsel's confrontation clause objection. The court, in its postconviction memorandum, ruled Rachuy's testimony be stricken, and thus there is no constitutional problem.

Conviction affirmed; postconviction relief denied.