**Harold GUSTAFSON, Petitioner, Appellant,**

v.

**STATE of Minnesota, Respondent.**

**No. C2–90–2608.**

Supreme Court of Minnesota.

Nov. 22, 1991.

M.G. Singer, Peterson & Singer, Minneapolis, for appellant.

Harold A. Gustafson, pro se.

Hubert H. Humphrey, III, Atty. Gen. and Tom Foley, Ramsey Co. Atty., Steven C. DeCoster, Asst. Ramsey Co. Atty., St. Paul, for respondent.

TOMLJANOVICH, Justice.

This is an appeal by petitioner Harold Gustafson from an order of the Ramsey County District Court denying his petition for postconviction relief from a 1984 conviction for first-degree murder. Petitioner makes two basic arguments in support of his contention that his Sixth Amendment rights were violated: first, that his attorneys did not represent him effectively at trial; and second, that he was denied conflict-free counsel when his attorneys agreed to share investigative duties with counsel for petitioner's co-defendant. We affirm.

I.

On Sunday, October 24, 1982, three armed men wearing ski masks attempted to rob the pharmacy at Mounds Park Hospital in St. Paul. A security guard, off-duty police officer Richard Walton, was fatally wounded when he exchanged gunfire with one of the would-be robbers. Tips from informants led police to William Dwyer and Timothy Eling. Dwyer was arrested and told police that he had accompanied Eling, Guy Hathaway and petitioner to the hospital on Friday, October 22, 1982, with the intent of robbing the pharmacy, but the attempt was called off at the last minute. Eling was arrested on Wednesday, October 27, 1982, and taken to a hospital for treatment of gunshot wounds in the lower right leg, wounds that resulted from shots fired by Walton.

Meanwhile, Hathaway and petitioner fled the state. They were arrested by FBI agents in California in 1984. After being jointly tried, both were convicted of first-degree murder and sentenced to life impris-

onment. Petitioner's conviction was affirmed on direct appeal in *State v. Gustafson*, 379 N.W.2d 81 (Minn.1985). The evidence of petitioner's guilt included (a) testimony of petitioner's association with Eling; (b) the testimony of William Dwyer, the accomplice to the aborted robbery attempt on October 22, and George Leslie, who helped plan the October 24 robbery with Hathaway, Eling and petitioner but decided against participating because he considered it too risky; and (c) evidence that petitioner and Hathaway had assumed false identities while they were fugitives.

Entering the trial, petitioner and his counsel had agreed that petitioner would testify in his own defense. In his opening statement, petitioner's counsel told the jury petitioner would take the stand to explain some damaging evidence expected to be presented by the prosecution: petitioner's past felony convictions; his violation of parole by leaving Minnesota before and after the day of the hospital killing; his presence in Mounds Park Hospital two days before the crime; and his ownership of an automatic weapon.

During the trial, however, plans changed and petitioner did not testify. The change came after Eling testified that his accomplices in the Mounds Park crime were Dwyer and Leslie, not petitioner and Hathaway. Eling's testimony was something of a surprise. He had told defendant's counsel that he would testify and told her what questions to ask, but he declined to say what his answers would be, except that petitioner would like them.

After Eling's testimony, petitioner told his counsel, "I've got it made, and I don't have to testify now." The statement apparently reflected petitioner's belief that he wouldn't have to admit under oath that he illegally possessed an automatic weapon while passing through several states. His counsel had advised petitioner that one disadvantage of testifying would be that he could increase the likelihood of prosecution on weapon charges.

The day after Eling's testimony, petitioner conferred with his attorneys at the counsel table for 5 to 15 minutes; the principals' accounts differ. After that conference, petitioner stated on the record that he would not testify. He told the court: "I feel after yesterday's testimony the truth has come out. I don't feel there is a need for—I believe I don't have to anymore." The jury was not persuaded, however, and found Hathaway and petitioner guilty of first degree murder.

## II.

Petitioner and Hathaway were tried together despite efforts by his attorneys to have separate trials. His severance motions were denied by the trial court, and those rulings were affirmed in *State v. Gustafson*, 379 N.W.2d at 84. With separate trials ruled out, counsel for petitioner and Hathaway agreed to cooperate in pretrial investigation and trial planning. The record from the postconviction hearing shows that petitioner's counsel relied on co-counsel's investigator for information about one and possibly two prospective witnesses who, petitioner believed, could testify that the alibis offered by Leslie and Dwyer for the time of the crime were false. At the postconviction hearing, his counsel did not recall ever talking to those prospective witnesses.

Petitioner's counsel did conduct the rest of petitioner's investigation. They read police reports, prosecution disclosures, the transcript of the Eling trial and other written information, then interviewed those persons petitioner had listed as potential favorable witnesses. After their investigation, petitioner's counsel chose not to call Craig Seifert and Donald Bell as witnesses. Seifert would have testified that he had been told by fellow jail inmate Douglas McArthur that the Mounds Park crime was planned by McArthur and Dwyer. Bell would have testified that Dwyer lied when he testified about not using weapons in past robberies. Petitioner's counsel did not call Seifert because he would have contradicted Eling's claim that Leslie and Dwyer were his co-conspirators. Seifert's credibility also was questionable because he was petitioner's friend and had a record of felony convictions. Bell was not called be-

cause of concerns about credibility and possible perjury.

At a time when he still planned to testify, petitioner stated on the record that he was "very" satisfied with his counsel. He maintains now that he was dissatisfied with counsel's investigation of his case from the beginning. On appeal he raises the following issues:

(1) Was petitioner denied effective assistance of counsel when his attorney told the jury he would testify about certain damaging evidence, but petitioner did not testify after the attorney advised him his testimony could subject him to additional charges?

(2) Was petitioner denied effective assistance of counsel where his attorneys did not pursue every lead or call every witness petitioner suggested?

(3) Did petitioner's counsel have an impermissible conflict of interest· because they shared investigative duties with attorneys for a co-defendant?

■ 1. The two leading cases on effectiveness of counsel are *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) and *Hill v. Lockhart*, 474 U.S. 52, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985), and the language and reasoning of those cases have been adopted by this court. *Gates v. State*, 398 N.W.2d 558 (Minn.1987). To gain postconviction relief for ineffective assistance of counsel, a defendant must show two things: (1) that counsel's representation "fell below an objective standard of reasonableness," and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 561 (quoting *Strickland*, 466 U.S. at 688, 104 S.Ct. at 2065). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* (quoting *Strickland*, 466 U.S. at 688, 104 S.Ct. at 2065).

■ "The scope of our review in a postconviction proceeding is limited to the question of whether there is sufficient evidence to sustain the findings of the postconviction court." *State v. Bliss*, 457 N.W.2d 385, 391 (Minn.1990) (quoting *Berry v.*

*State*, 364 N.W.2d 795, 796 (Minn.1985)). "A postconviction court's decision will not be disturbed except upon an abuse of discretion." *Id.* (citation omitted). In this case, the postconviction court applied the *Strickland–Gates* standard and found that the result of the trial probably would have been different if petitioner had testified. The postconviction court also found it was a major mistake for petitioner not to testify. But the court concluded that relief was not due because the decision not to testify was made voluntarily by petitioner. We affirm.

The decision of whether to testify is for the defendant after full consultation with counsel, and courts "must give great deference to choices that are made under the explicit direction of the client." *Mulligan v. Kemp*, 771 F.2d 1436, 1441 (11th Cir. 1985), *cert. denied*, 480 U.S. 911, 107 S.Ct. 1358, 94 L.Ed.2d 529 (1987); *see also Jones v. Barnes*, 463 U.S. 745, 751, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983).

As explained by the postconviction judge, who also presided over the trial, it is easy to see what happened. Petitioner became so euphoric after Eling's testimony that he not only concluded he would be acquitted, but decided he would not have to testify about possessing an illegal weapon and risk facing charges elsewhere. After talking it over with his attorneys, petitioner stated on the record he was electing not to testify. On appeal, petitioner contends his counsel, in effect, coerced him into not testifying by offering unsound legal advice and forcing him to make a rapid decision. Neither of these contentions has merit. The decision on whether to testify was not based solely on 5 to 15 minutes of discussion at counsel table. It had been discussed often since preparation for the case began. Further, petitioner's excited statement after Eling's testimony shows that defense counsel hardly had to pressure him into not testifying. In fact, the opposite was true; counsel cautioned him not to make a hasty decision.

As for the allegations of incompetent legal advice, it was not objectively unreasonable under *Gates* for counsel to talk

with petitioner about all possible conse-
quences of testifying. And those conse-
quences included the chance that a prose-
cuting authority might use petitioner's tes-
timony against him on a weapon charge.
While counsel's concern about that possibil-
ity might have been exaggerated, it was
not presented in such a way as to amount
to coercion. It was presented as a factor
to consider as petitioner made up his mind.
After weighing all of the factors, petitioner
chose to rest his chances on Eling's testi-
mony and not take the stand. That deci-
sion was his to make, he made it, and now
he must abide by it.

2. "Which witnesses to call and
what evidence to present to the jury are
matters of trial strategy, which are within
the discretion of the trial counsel." *Bliss,*
457 N.W.2d at 392; *see also Burger v.
Kemp,* 483 U.S. 776, 794–95, 107 S.Ct. 3114,
3126, 97 L.Ed.2d 638 (1987). The postcon-
viction court labeled the choice not to call
Bell and Seifert a reasonable tactical deci-
sion, given counsel's serious qualms about
their credibility. We agree. Similarly, we
find no merit in petitioner's claims that his
counsel conducted an inadequate investiga-
tion by failing to produce certain witnesses.
It is within trial counsel's discretion to for-
go investigation of leads not reasonably
likely to produce favorable evidence.
*Kemp,* 483 U.S. at 794–95, 107 S.Ct. at
3126. In this case, the investigation
sought by petitioner was aimed at under-
mining the credibility of witnesses Dwyer
and Leslie. Similar collateral impeachment
evidence was properly excluded by the trial
court. *See State v. Gustafson,* 379 N.W.2d
at 84. There is no reason to believe this
evidence would or should have been treated
differently.

3. "[A] defendant who shows that
a conflict of interest actually affected the
adequacy of his representation need not
demonstrate prejudice in order to gain re-
lief. But until a defendant shows that his
counsel actively represented conflicting in-
terests, he has not established the constitu-
tional predicate for his claim of ineffective
assistance." *Cuyler v. Sullivan,* 446 U.S.
335, 349–50, 100 S.Ct. 1708, 1719, 64

L.Ed.2d 333 (1980) (citation omitted).
There could be a case in which a shared
investigator actually affected the represen-
tation, but this is not it. From the record,
it appears the only investigation turned
over to petitioner's co-counsel involved in-
formation that would have been inadmissi-
ble as collateral impeachment evidence.
There is no showing that the investigative
assignment actually affected petitioner's
representation, so no relief is due.

  Affirmed.