STATE of Minnesota, Respondent,

v.

Phillip Lewis COLE, Appellant.

No. C0–95–648.

Supreme Court of Minnesota.

Jan. 5, 1996.

Hubert H. Humphrey, III, Attorney General, St. Paul, Michael Junge, McLeod County Attorney, Jody Winters, Assistant McLeod County Attorney, Glencoe, for respondent.

John M. Stuart, Minnesota State Public Defender, Leslie J. Rosenberg, Special Assistant State Public Defender, Minneapolis, for appellant.

## OPINION

ANDERSON, Justice.

On December 15, 1989, Hutchinson police officer Michael Hogan was shot and killed while investigating the return of stolen merchandise to the J.C. Penney department store in Hutchinson, Minnesota. Petitioner, Phillip Lewis Cole, was indicted for the murder of Officer Hogan and for other crimes which occurred during a three-day period from December 15 to December 18, 1989. At trial, Cole pleaded guilty to felony theft, and a jury found him guilty of murder in the first degree (intentional murder of a peace officer); murder in the second degree (intentional murder); murder in the second degree (felony murder); five counts of assault in the second degree; three counts of kidnapping; five counts of use or possession of a dangerous weapon; and one count of felon in possession of a pistol. The district court sentenced Cole to life imprisonment for first-degree murder, 25 months concurrent to the life sentence for felony theft, 23 months concurrent to the life sentence for the conviction of felon in possession of a pistol, five years consecutive for each of the five assault convictions, five years consecutive for one of the three kidnapping convictions, and five years concurrent for the remaining two kidnapping convictions. In total, Cole was sentenced to life imprisonment, plus 30 years consecutive to the sentence of life imprisonment for the crimes of which he was convicted.

Cole made no direct appeal from his convictions but, on January 3, 1995, over four years after sentencing, Cole petitioned the McLeod County District Court for postconviction relief, seeking a new trial or, alternatively, resentencing. Cole asserted five grounds for relief, arguing, among other things, that his voluntary intoxication rendered him incapable of forming the intent to kill. The district court denied Cole's petition on its merits and its timeliness. On appeal, Cole contends that the court abused its discretion in not granting a new trial or resentencing him, and also asserts that his petition was timely. We affirm.

On the afternoon of December 15, 1989, petitioner, Phillip Lewis Cole, and his friends, Jack Rivers, Darlene Hausman and Rose Boyce, travelled by car from Minneapolis to Hutchinson for the purpose of shoplifting and returning stolen merchandise for cash. Cole and Boyce had been drinking that morning. On the drive to Hutchinson, Cole, Boyce, Hausman and Rivers continued drinking, and also consumed various drugs— heroin, Dilaudid, and marijuana.

After stopping at other retail stores in Hutchinson, Cole and his friends went to the J.C. Penney store to attempt to return merchandise that had been stolen from the store earlier that same day. Rose Boyce was the first member of the group to enter the store. She returned two nightgowns for $50. Rivers was the next member of the group to enter the store. Barbara Erickson, the clerk who waited on Rivers, asked him for some identification, and he provided a copy of a California birth certificate in the name of Gerry Rivers. Rivers successfully returned two toddler outfits for $44.

Cole, at the urging of Hausman, then went into the store and attempted to return a boy's sweater and slacks. Sharon Tupa, a clerk in the boys department, waited on Cole and began processing his return. Tupa testified that Cole seemed "a little nervous," and this caused her to become suspicious. When Tupa asked Cole for identification, he replied that he could provide a birth certificate as identification, but would have to go get it. Cole left the store, and Tupa, uncomfortable with the return, went to April Brandt, the merchandise manager, and told Brandt that the return "seemed strange." Brandt returned with Tupa to the boys department. Cole presented a birth certificate in the name of Jack Rivers as identification, and said that his wife had sent him to return the merchandise. Brandt questioned Cole about his wife, his residence and the birth certificate. Cole gave inconsistent answers to her questions and became agitated. Brandt told Cole she would need to have the return validated by the store manager. Brandt then proceeded to call the Hutchinson Police Department to inform them that she thought Cole was a shoplifter.

Officer Michael Hogan, a licensed peace officer with the Hutchinson Police Department, responded to Brandt's call and, shortly thereafter, arrived at the store, dressed in his police uniform. Brandt directed Officer Hogan to the shoe department stockroom in the back of the store where she briefed him on the situation. Brandt then returned to the retail area of the store. Brandt told Cole that there did not appear to be a problem, but the manager wanted to see the merchandise. Brandt then took Cole to the shoe stockroom where Officer Hogan was waiting to meet with him.

After Cole gave some more inconsistent answers and Barbara Erickson failed to identify Cole as the same customer who had returned merchandise earlier, Brandt, Cole and Officer Hogan went to the store office where Officer Hogan and Brandt suggested they call Cole's wife at the "Hutchinson residence" to verify his identity. Brandt was later to testify that when Cole explained the reasons for returning the merchandise, he was quite coherent and seemed to Brandt to be genuine about what he was saying. As Cole dialed the number, Brandt noticed that Cole was not dialing a Hutchinson exchange, and told Officer Hogan that she thought Cole was lying to them. Officer Hogan took the phone, spoke with the person at the other end, and ultimately identified himself to the person on the phone as Officer Hogan from the Hutchinson Police Department. Officer Hogan then told the person on the phone that he was going to take Cole downtown to

find out who he really was because Cole was trying to defraud the store.

Cole then grabbed his own hair and said, "I don't need this. I don't need this," took two steps away from Officer Hogan, and turned. As he turned, Cole had a gun in his hand. Cole held his arm straight out, pointed the gun directly at Officer Hogan's head, pulled the trigger and shot Officer Hogan in the forehead above the left eye. Officer Hogan was still on the phone, not looking up, when Cole shot him. Officer Hogan died as a result of the shooting. Cole later testified that he shot Officer Hogan in part out of "fear of going back to prison for all this time," because Officer Hogan said that he was taking Cole downtown to the police station. Cole knew that he faced possible completion of a prior prison sentence in Minnesota for parole violations. That could mean his return to prison until 2006. He also faced return to prison in Indiana for offenses he committed in that state.

After the shooting, Cole turned the gun toward Brandt. Brandt fell to the floor, put her hands behind her head and waited to be shot. She testified that she thought she was dead, that her life was over and that she would never see her children again. Cole did not shoot Brandt, but left the office and ran out the front door of the store and into the parking lot, where he ran in three circles and then ran to a nearby McDonald's. After she thought Cole had left the office, Brandt crawled on her hands and knees to the phone, dialed 911, and reported that a police officer had been shot at the J.C. Penney store.

At McDonald's, Cole approached a car in the drive-thru lane driven by Greg Larson and occupied by one passenger, Joseph Miscavage. Cole told Larson and Miscavage that there had been an emergency and that he needed a ride. Larson and Miscavage denied the request for the ride. Cole walked away at first, but came back, demanded a ride, and jumped into the back seat of the car. Both Larson and Miscavage testified that Cole put a gun to the back of Misca-

vage's head. Cole told Larson and Miscavage not to do anything stupid, that he had just shot a police officer, and told Larson to drive him out of town. Larson drove to Minneapolis, and Cole asked to be dropped off in the Lake Street area. Cole was in the car with Larson and Miscavage for approximately one hour. After dropping Cole off, Larson and Miscavage found a police officer and reported the incident.

Three days later, on December 18, while in Minneapolis, Cole learned that the police were coming to the house where he was hiding. He left his hiding place and, at gunpoint, commandeered a car being driven by a woman near northeast Minneapolis. He took control of the car, assaulted the driver, and forced her to get in the back seat.[1] Shortly thereafter, when Cole was driving the car in a westerly direction on Highway 7, a Minnetonka police officer attempted to stop Cole because the car had a broken tail light. Cole did not respond to the police officer's attempts to get him to stop. The officer turned on his squad car's lights and siren, and a 24–mile high-speed chase ensued. After encountering a roadblock set up by McLeod County sheriff's deputies, Cole's car struck a squad car, and in attempting to get around another squad car, Cole went into a ditch near McLeod County Road 9. The officers on the scene ordered Cole and the woman out of the car. Cole held a gun to the woman's head, and threatened to kill her if police did not back away. Cole then attempted to enter a nearby squad car, which turned out to be locked, and then ran with the woman hostage to a nearby farmhouse.

In the farmhouse were a husband and wife and their two-year-old daughter. When the husband heard police sirens and saw flashing lights outside his home, he looked outside and saw Cole and another person coming toward the farmhouse. He joined his wife and daughter in an upstairs bathroom and locked all three of them inside. Cole entered the farmhouse, went upstairs with the woman hostage, told the family that he had killed a police officer in Hutchinson, and asked if

1. Cole was charged, convicted, and sentenced to a concurrent sentence in a separate proceeding in Hennepin County District Court for criminal

sexual conduct in the first degree perpetrated against the woman driver.

they had any guns. Cole told the family to come out of the bathroom, and that he was not going to hurt them. Meanwhile, the police surrounded the farmhouse. Cole was in the farmhouse from approximately 10:30 p.m. on December 18 to approximately 5:15 a.m. the next day. During that time, Cole negotiated with police for release of the hostages. He threatened the hostages verbally during the course of the negotiations, and on one occasion pointed a gun directly at the husband. Cole, the family and the woman hostage left the house together at approximately 5:15 a.m. on December 19 and Cole surrendered to the police. During the approximately seven hours that Cole was in the farmhouse, he took food and some money, but did not physically assault any of the hostages. Cole later gave a statement to police, admitting that he had shot Officer Hogan, and that he had made certain threatening remarks to the residents of the farmhouse.

A McLeod County Grand Jury handed down a 16–count indictment against Cole: two counts of murder in the first degree (premeditated murder and intentional murder of a peace officer); one count of murder in the second degree (intentional murder); five counts of assault in the second degree; five counts of kidnapping; and one count each of felony theft, felon in possession of a pistol, and aggravated robbery.

Cole was tried before a jury in McLeod County District Court, and raised the defense that his voluntary intoxication rendered him incapable of having the requisite intent to kill. Cole did testify at trial, and stated that he had slept only a total of about eight hours during the week prior to the shooting. He also testified that he had been using crank, speed, cocaine, heroin, Dilaudid, morphine and alcohol during that week. Cole testified that on the day of the shooting, he drank beer, used methamphetamine, heroin, Dilaudid, marijuana and cocaine, and that he "overamped." During the trial, a defense expert, a forensic scientist, testified about the effects of marijuana, heroin, morphine and Dilaudid. Included in the expert's recitation of possible effects of these drugs were: incoordination, dizziness, mental clouding,

agitation, and "overamping"—the condition of being overstimulated beyond one's ability to control one's feelings. Cole contends that he did not appear intoxicated at the time of the shooting because he was used to acting sober while he was high in prison.

During the trial, Cole pleaded guilty to felony theft. At trial, the court, pursuant to the request of defense counsel, instructed the jury on the lesser-included offenses of second-degree felony murder and five counts of misdemeanor use or possession of a dangerous weapon. The jury found Cole guilty of murder in the first degree (intentional murder of a peace officer); murder in the second degree (intentional murder); murder in the second degree (felony murder); assault in the second degree (5 counts); use or possession of a dangerous weapon (5 counts); kidnapping (3 counts); felon in possession of a pistol; misdemeanor use or possession of a dangerous weapon (5 counts). The trial resulted in a hung jury on three counts of kidnapping and the state later dismissed those charges. The jury found Cole not guilty of murder in the first degree (premeditated) and not guilty of aggravated robbery.

Cole admitted that he had previously been convicted of aggravated robbery, aggravated assault, and leaving the scene of an accident. He also admitted that his civil rights had not yet been restored due to his prior convictions. Prior to sentencing, Cole moved to vacate the convictions of intentional murder and assault in the second degree. The motion was denied. On September 13, 1990, Cole was sentenced to life imprisonment for the conviction of first-degree murder, 25 months concurrent to the life sentence for the conviction of felony theft, 23 months concurrent for the conviction of felon in possession of a pistol, five years consecutive for each of the five assault convictions, five years consecutive for one of the kidnapping convictions, and five years concurrent for the remaining two kidnapping convictions. He did not file a direct appeal from his convictions or sentencing.

On January 3, 1995, more than four years after his sentencing, Cole filed a petition for postconviction relief in McLeod County District Court, and asserted the following:

1. The evidence was insufficient to sustain his conviction because the state did not prove beyond a reasonable doubt that he intended the death of the peace officer.

2. The conviction for felony murder was not supported by a proper predicate felony.

3. The district court erred in failing to instruct the jury on the lesser-included offense of manslaughter in the second degree.

4. The convictions for intentional murder and felony murder are legally inconsistent, as are the convictions for assault and reckless use of a dangerous weapon; therefore, the greater charge must be vacated.

5. Alternatively, Cole should be resentenced to concurrent and not consecutive sentences so as not to unduly exaggerate the criminality of his actions.

Cole requested that the judgment of conviction be set aside, or, alternatively, that a new trial be granted, or, alternatively, that he be resentenced. The postconviction court denied the requested relief "on its merits and its timeliness." On appeal from denial of postconviction relief, Cole asserts that the judge abused his discretion in denying the petition, and also asserts that his petition was timely.

## I.

This court reviews a postconviction proceeding only to determine whether there is sufficient evidence to sustain the postconviction court's findings. *Scruggs v. State,* 484 N.W.2d 21, 25 (Minn.1992) (citing *Gustafson v. State,* 477 N.W.2d 709, 712 (Minn. 1991)). We will not disturb the postconviction court's decision unless the court abused its discretion. *Id.*

Cole first argues that he was voluntarily intoxicated at the time of the murder of Officer Hogan, and that he was incapable of forming the intent required for conviction of intentional murder of a peace officer. He asserts that during the week of the shooting he had, at most, eight hours of sleep, averaging twenty minutes a night. During this time period, Cole claims he used a variety of severely addictive and illegal drugs, including a stimulant called crank, amphetamines, cocaine, heroin, Dilaudid, morphine and alcohol. On the day of the shooting he claims to have drunk beer, used methamphetamine, cocaine, heroin, Dilaudid and smoked marijuana. He testified that when he arrived at the J.C. Penney store, he felt high on the drugs, he was shaking because of the drugs he had taken, and everything seemed distorted.

Minnesota Statute § 609.185 provides that a person is guilty of murder in the first degree if the person "causes the death of a peace officer * * * with intent to effect the death of that person or another, while the peace officer * * * is engaged in the performance of official duties." Minn.Stat. § 609.185(4) (1994). With respect to voluntary intoxication as a defense, "when a particular intent or other state of mind is a necessary element to constitute a particular crime, the fact of intoxication *may* be taken into consideration in determining such intent or state of mind." Minn.Stat. § 609.075 (1994) (emphasis added). The possibility of intoxication does not create a presumption that the person is not capable of intending to commit murder. *State v. Wahlberg,* 296 N.W.2d 408, 416 (Minn.1980). Defendant's intoxication is but one of the facts that the factfinder is free to consider in deciding whether the defendant had the requisite specific intent. *State v. Hale,* 453 N.W.2d 704, 707 (Minn.1990). If the record contains sufficient evidence to support the conclusion reached by the jury on the intoxication issue, that conclusion will not be reversed, despite the existence of some evidence to the contrary. *Wahlberg,* 296 N.W.2d at 416.

Here, the evidence reveals that Cole had the ability to enter the J.C. Penney store to return merchandise, and was able to return to the car to get a birth certificate for identification; he was coherent enough to seem to Brandt to be genuine in what he was saying when he explained the reason for making the return; he testified that the reason he shot Officer Hogan was his fear of return to prison; and he commandeered a car outside the store to effect his escape. This is more than sufficient evidence to support the conclusion

reached by the jury that Cole was capable of forming the intent to kill. The postconviction court did not abuse its discretion in not disturbing the jury's conclusion on this issue.

## II.

■ Cole next argues that the district court erred in not instructing the jury on second-degree manslaughter under Minn. Stat. § 609.205(1). Second-degree manslaughter is defined as causing the death of another by "the person's culpable negligence whereby the person creates an unreasonable risk, and consciously takes chances of causing death or great bodily harm to another." Minn.Stat. § 609.205(1) (1994). Cole claims that he did not intend to kill Officer Hogan, and that he was not aiming when he shot the police officer; thus, he was only culpably negligent for the killing. The state counters this claim by contending that when Cole shot Officer Hogan, he acted intentionally and in a criminal manner to protect his freedom.

■ Minnesota Statute section 609.04, subd. 1 provides that upon prosecution the accused "may be convicted of either the crime charged or an included offense, but not both." Every lesser degree of homicide is intended to be characterized as an included offense. Minn.Stat. § 609.04 (1994); *State v. Leinweber*, 303 Minn. 414, 421, 228 N.W.2d 120, 125 (1975). In a homicide case, it is preeminently the district court's duty in the exercise of its discretion to determine what lesser degrees of homicide to submit to the jury. *Leinweber*, 303 Minn. at 421, 228 N.W.2d at 125. The refusal to give a requested jury instruction lies within the discretion of the district court and no error results if no abuse of discretion is shown. *State v. Blasus*, 445 N.W.2d 535, 542 (Minn. 1989). When a defendant requests that a jury receive instruction on a lesser-included offense, a two-part test is applied: (1) whether the lesser offense is necessarily included under Minn.Stat. § 609.04, and (2) whether the evidence adduced at trial would reasonably support a conviction of the lesser degree and at the same time is such that a finding of not guilty of the greater offense would be justified. We have referred to the second part of this test as the "rational basis" test.

*State v. Griffin*, 518 N.W.2d 1, 3 (Minn.1994). *See Leinweber*, 303 Minn. at 422, 228 N.W.2d at 125–26.

The state concedes that the first part of the two-part test is satisfied—second-degree manslaughter is a lesser-included offense of first-degree murder. Cole argues that the second part of the test is at issue here; that is, whether the evidence would reasonably support an acquittal on first-degree murder (intentional murder of a peace officer) and a conviction on second-degree manslaughter. *See Bellcourt v. State*, 390 N.W.2d 269, 274 (Minn.1986). The state argues that the district court was within its discretion in concluding that no reasonable jury could acquit Cole of first-degree murder and second-degree murder, and convict him of second-degree manslaughter. We agree with the state's argument. The necessary elements of first-degree murder of a peace officer, including the intent to kill, have been satisfactorily established in this case. Moreover, no evidence was brought forth which reasonably supports a conviction for second-degree manslaughter. Our review of the record in this case supports the conclusion that the evidence does not reasonably support an acquittal of the greater offense—first-degree murder of a police officer—and a conviction of the lesser-degree offense—second-degree manslaughter. The district court acted within its discretion in refusing to instruct the jury on second-degree manslaughter, and the postconviction court properly denied relief on this issue.

## III.

■ Cole next asserts that the verdicts of guilty of first-degree intentional murder of a peace officer and second-degree intentional murder are legally inconsistent with a verdict of second-degree felony murder. Verdicts are legally inconsistent when proof of the elements of one offense negates a necessary element of another offense. *State v. Moore*, 438 N.W.2d 101, 108 (Minn. 1989). The elements of second-degree felony murder are set forth in Minn.Stat. § 609.19(2) (1994), which provides that whoever "[c]auses the death of a human being, *without intent to effect the death* of any

person, while committing or attempting to commit a felony offense other than criminal sexual conduct in the first or second degree with force or violence" is guilty of murder in the second degree. *Id.* (emphasis added). Cole asserts that lack of intent is an element of second-degree felony murder, necessarily negating the specific intent element of first-degree intentional murder of a peace officer and of second-degree intentional murder and that therefore verdicts of second-degree felony murder and any intentional murder are legally inconsistent.

■■■ Second-degree felony murder does not require proof of a specific mental element. *State v. Branson,* 487 N.W.2d 880, 882 (Minn.1992). The elements of second-degree felony murder as set out in CRIMJIG 11.16 are that there was a killing and that the killing occurred during the commission of a specified predicate felony. Minn.Stat. § 609.19(2); *see also* 10 Minn. Dist. Judges Ass'n, *Minnesota Practice,* CRIMJIG 11.16 (3d ed. 1990) ("It is not necessary that the state prove that the defendant had an intent to effect the death * * * "). The "felony murder rule" allows one whose conduct brought about an unintended death in the commission of a felony to be found guilty of murder by imputing malice when there is no specific intent to kill. *Branson.* 487 N.W.2d at 881. Lack of intent is not an element of second-degree felony murder. *Id.* at 882. Accordingly, the verdicts of first-degree intentional murder of a peace officer and second-degree intentional murder and second-degree felony murder are not legally inconsistent, for no element of one crime negates a necessary element of the other.

### IV.

■■■ Cole also contends that the verdicts of guilty of second-degree assault and guilty of use or possession of a dangerous weapon are legally inconsistent because the two offenses require different and inconsistent mental states. Second-degree assault is a specific intent crime; it is "(1) an act done with intent to cause fear in another of immediate bodily harm or death; or (2) the intentional infliction of or attempt to inflict bodily harm upon another." Minn.Stat. § 609.02,

subd. 10 (1994). An accused may be convicted of misdemeanor use or possession of a dangerous weapon if he or she: "(1) recklessly handles or uses a gun or other dangerous weapon or explosive so as to endanger the safety of another; or (2) intentionally points a gun of any kind, capable of injuring or killing a human being and whether loaded or unloaded, at or toward another." Minn.Stat. § 609.66, subd. 1(1) and (2) (1994).

The jury was instructed, at the request of Cole, that the elements of the charge of use or possession of a dangerous weapon are: "First, defendant, number one, recklessly handled or used a gun and, number two, intentionally pointed a gun of any kind capable of injuring or killing a human being, and whether loaded or unloaded." *See* Minn. Stat. § 609.66, subd. 1(1) and (2). Cole asserts that he was convicted only under section 609.66, subd. 1(1), governing reckless handling or use of a weapon. However, as described above, the jury was instructed on both subpart (1) and subpart (2) of section 609.66, that is, both the reckless handling and the intentional pointing of a gun, and returned its five verdicts of guilty of "use/possession of dangerous weapon" without making a specific reference to either subpart (1) or (2) of section 609.66. The jury was also instructed, with respect to assault, that: "[t]his means that the defendant committed an act with the intent of causing [the victims] to fear immediate bodily harm or death."

Intent to commit assault and intent to point a gun are not inconsistent mental states. Cole's intent to cause fear in Brandt was carried out by his intentional pointing of a gun at her; the two intents are entirely consistent. Moreover, the terms "recklessness" and "intent" are not mutually exclusive. This court discussed the meaning of "reckless" in *State v. Zupetz,* 322 N.W.2d 730 (Minn.1982), noting that "[a] person acts 'recklessly' when he consciously disregards a substantial and unjustifiable risk that the element of an offense exists or will result from his conduct * * *. [Both the reckless actor and the intentional] actor [create] a *risk* of harm. The reckless actor is *aware* of the risk and disregards it." *Id.* at 733 (quot-

ing 2 C. Torcia, *Wharton's Criminal Law* § 168 at 272 (14th ed.1979)). "Intentionally" means that the actor either has a purpose to do the thing specified or believes that the act performed will cause that result. The actor must also have knowledge of the facts necessary to make the conduct criminal and "which are set forth after the word 'intentionally.'" Minn.Stat. § 609.02, subd. 9(3). In the relevant statute, the words following "intentionally" are "points a gun of any kind." Minn.Stat. § 609.66, subd. 1(2).

The term "recklessly handled," meaning Cole's conscious disregard of the substantial, unjustifiable risk that fear of immediate bodily harm will be created, does not preclude an intent to create fear or an intent to inflict bodily harm, nor does it preclude intent to point a gun. The term "reckless" refers to the risk created, not the mental intent which resulted in an act which produced fear or injury. *See State v. Netland,* 535 N.W.2d 328, 332 (Minn.1995) (Tomljanovich, J., concurring specially). Cole certainly could have intended to cause fear of immediate bodily harm at the same time he was aware of and consciously disregarded a substantial risk that fear of immediate bodily harm would result from the manner in which he handled a gun. We conclude that guilty verdicts of second-degree assault, pursuant to section 609.222, and reckless handling and use or intentional pointing of a gun, pursuant to section 609.66, are not legally inconsistent because no element of one crime necessarily negates an element of the other.

## V.

■ Cole next asserts that his conviction for second-degree felony murder was not supported by a proper predicate felony. More particularly, Cole claims that the district court improperly instructed the jury that it could find felony murder based on an underlying property offense. *See* Minn.Stat. § 609.19(2). He further asserts that the underlying offense here, shoplifting, does not constitute a felony nor does it involve a special danger to human life. Minnesota Statute section 609.19(2) provides that a person is guilty of murder in the second degree if that person causes the death of a human being while committing or attempting to commit a felony offense other than criminal sexual conduct in the first or second degree with force or violence. The jury was instructed that the elements of second-degree felony murder in this case required the jury to find that: "defendant, at the time of effecting the death of Michael Hogan, was committing, or attempting to commit, the felony offense of theft or the felony offense of felony assault in the second degree."

This court noted that application of the felony murder statute, prior to 1981, was limited to predicate felonies involving a "special danger to human life." *Branson,* 487 N.W.2d at 883 (citing *State v. Nunn,* 297 N.W.2d 752 (Minn.1980)). In 1981, the legislature reclassified felony murder, changing it from third-degree to second-degree murder. It also removed from the felony murder statute the express limitation that a proper predicate felony be "a felony upon or affecting the person whose death was caused by another" and substituted the words "a felony offense other than criminal sexual conduct in the first or second degree with force or violence." Act of May 19, 1981, ch. 227, §§ 10 and 11, 1981 Minn. Laws 1006, 1010 (*codified at* Minn.Stat. § 609.19(2) (1982)). In *Branson,* we noted that the statute was amended in 1981 to eliminate language which limited the underlying felony to those involving a special danger to human life. However, in 1983, after the statute was amended, we reiterated the holding in *Nunn* that the felony murder rule can be applied if the underlying felony is a property offense and the offense as committed involves a special danger to human life. *State v. Back,* 341 N.W.2d 273, 277 (Minn.1983). Cole asserts that the district court mistakenly relied upon *Back.*

■ Cole's argument lacks merit. First, we note that Cole entered a plea of guilty to the offense of felony theft. Second, he made no objection to the instructions at the time of trial, and the instructions were not misleading or confusing on fundamental points of law. *See State v. Butler,* 295 N.W.2d 658, 659 (Minn.1980) (notwithstanding failure to object to district court's instructions, this court can reverse if instructions were misleading or confusing on fundamental points of

law). Third, even if we apply the limitation that a proper predicate felony must involve a special danger to human life, the circumstances of this case clearly demonstrate that special danger existed. When determining if the underlying felony involves a special danger to life, we not only consider the elements of the underlying felony in the abstract, but also the facts of the particular case and the circumstances under which the felony was committed. *Nunn,* 297 N.W.2d at 754. It is apparent that the crime, as committed in this case, did involve a special danger to human life—Cole was armed with a gun when he entered the store; the gun was loaded; the crime took place in a public area, a department store; ultimately, a police officer was killed; and force and violence were used during the escape from the crime scene. *See State v. Russell,* 503 N.W.2d 110, 113 (Minn. 1993). Fourth, assault in the second degree itself forms a proper predicate felony to a felony murder conviction—assault is not a property crime, but a crime against the person. *See* Minn.Stat. §§ 609.221–224 (1994). We conclude that Cole's second-degree felony theft and second-degree assault were proper predicate felonies to his conviction for second-degree felony murder.

### VI.

Cole also argues that the six five-year consecutive sentences imposed for assault and kidnapping unfairly exaggerate the criminality of his conduct. Ordinarily, if a single behavioral incident constitutes more than one criminal offense, multiple sentences are prohibited. Minn.Stat. § 609.035 (1988). However, when crimes are committed against different persons in the same incident, the district court has discretion to impose one sentence per victim so long as such sentencing does not exaggerate the criminality of the defendant's conduct. *State v. Lee,* 491 N.W.2d 895, 901 (Minn.1992) (citing *State v. Montalvo,* 324 N.W.2d 650, 652 (Minn. 1982)). The court looks to the imposition of sentences in other cases to determine whether sentencing exaggerates the criminality of conduct. *Lee,* 491 N.W.2d at 902. For example, in *Montalvo,* this court affirmed the imposition of consecutive sentences for each of two counts of aggravated assault in the second degree—assault with a dangerous weapon—when there were two victims of the assaults. 324 N.W.2d at 652. This court stated that consecutive sentencing when there were multiple victims did not unfairly exaggerate the criminality of the defendant's conduct.

Cole's acts caused numerous victims and hostages great fear of harm over an extended period of time. He intentionally murdered a police officer; assaulted a store clerk by pointing a gun at her, causing her to fear she was about to die; commandeered a car with two hostages for over an hour in order to escape to Minneapolis; commandeered a second car, taking a hostage at gunpoint, for a second escape from police; and took a three-member family hostage at gunpoint in their home for over seven hours. The district court did not abuse its discretion by imposing consecutive sentences for these crimes involving multiple victims.

Having determined that the district court properly denied the requested postconviction relief on its merits, we need not reach the issue of whether Cole's petition was timely.

We affirm the postconviction court's denial of the petition for postconviction relief in all respects.