**STATE of Minnesota, Respondent,**

v.

**Dale Robert STEINBUCH, Appellant.**

**No. C2–93–274.**

Supreme Court of Minnesota.

April 8, 1994.

John M. Stuart, State Public Defender, Mark F. Anderson, Leslie J. Rosenberg, Sp. Asst. State Public Defenders, Minneapolis, for appellant.

Hubert H. Humphrey, III, Atty. Gen., Margaret H. Chutich, Asst. Atty. Gen., St. Paul, and Roger S. Van Heel, Stearns County Atty., St. Cloud, for respondent.

## OPINION

GARDEBRING, Justice.

Appellant Dale Robert Steinbuch was indicted on three counts of first degree murder, in violation of Minn.Stat. § 609.185(1), and one count of first degree murder committed while engaging in criminal sexual conduct, in violation of Minn.Stat. § 609.185(2). The charges were in connection with the murders of his wife, step-daughter, and daughter, on or about July 17, 1991, in their home in St. Cloud, Minnesota. At the close of evidence, the trial court dismissed the count involving first degree murder while committing criminal sexual conduct. The jury then convicted appellant of second de-

gree murder of his wife, and first degree murder of his step-daughter and daughter. Appellant was sentenced to two life terms for the first degree murder convictions, and 305 months for the second degree murder conviction, with the sentences to be served consecutively.

Appellant appeals his convictions on the grounds that: 1) there was insufficient evidence to support indictment on the charge of first degree murder while committing sexual assault, and dismissal of the charge did not cure the prejudice created by introduction of evidence on that charge; 2) the evidence was insufficient to support his convictions; 3) introduction of evidence of prior crimes was irrelevant and overly prejudicial; and 4) introduction of evidence on his wife's state of mind was irrelevant and overly prejudicial. Appellant raises additional issues in his pro se brief. We affirm and uphold the convictions.

At trial, appellant admitted that he had killed his wife, but blamed the murder of the children on her. Trial testimony indicated that on Wednesday, July 17, 1991, at about 7:30 p.m., appellant was arrested for drunk driving in Wisconsin. The arresting officer followed appellant's car over three miles as appellant drove erratically, narrowly missing guard rails and other vehicles and swerving from lane to lane. When stopped, appellant repeatedly told the officer, "You can't prove a thing." The officer smelled alcohol on appellant's breath and saw open liquor containers on the front floor of the vehicle. When appellant was asked to exit the vehicle and to provide some identification, he took a swing at the officer and further resisted arrest.

Following appellant's arrest, St. Cloud police were asked to check with Geraldine O'Meara, appellant's wife and the registered owner of the car he was driving. St. Cloud police attempted several times to contact O'Meara beginning on Wednesday night, July 17, 1991, and continuing through Saturday, July 20, 1991. However, O'Meara's house was closed up as if the occupants were on vacation, with all windows closed and drapes tightly drawn. There was no response to officer's knocking. On July 20, 1991, in response to a call requesting that

police check on the welfare of the family, police again went to the house. After knocking and receiving no answer, officers entered the house and found the body of appellant's wife lying in the downstairs bedroom in a pool of blood.

Officers also found the body of appellant's three year old daughter lying face down in her bed on the second floor, and the body of appellant's twelve year old step-daughter lying face down on the basement floor. The three year old's ankles had been bound with tape and a cord was around her neck. The twelve year old's ankles were also taped. Her hands were both taped and tied with rope behind her back. She had a dog leash knotted tightly around her neck. She was dressed in a short sleeved t-shirt over a swim suit, the top of which was down such that her breasts were exposed.

Blood was found throughout the house. Bloody fingerprints and footprints found in the kitchen were appellant's and bloody shoe-prints matched the shoes appellant was wearing at the time of his arrest. A fingerprint and palmprint found on the weight bar which was apparently used to kill appellant's wife was also consistent with that of appellant. A forensic scientist testified that the blood found in the house was consistent with that of either appellant's wife or step-daughter, and that none of it could have come from appellant. Other evidence recovered included a metal bar with O'Meara's blood and hair on it, found near O'Meara's feet. Rope found in the garage was similar to that found on the wrists of the children, and a roll of tape found in the living room was consistent with the tape found on the girls' bodies. When the house was cleaned on July 29, 1991, the corpse of the family dog was discovered in a roll of carpet padding which was being removed from the basement. The dog had been asphyxiated.

O'Meara was determined to have died from multiple blunt traumatic injuries. These injuries were consistent with being caused by the metal bar and weight sleeve found near her body. A doctor testified that she could not have lived more than 5 to 10 minutes after receiving the injuries to her forehead. Both children died of asphyxia due to liga-

ture strangulation. The decomposition of all three bodies was consistent with death occurring on Wednesday July 17, 1991.

Other evidence indicated that appellant's wife had been at her nursing job on the night of July 16, that she had gone home for supper early in the evening and that she had talked to appellant on the phone at about 10:30 p.m. Testimony of co-workers indicated that she left her place of employment shortly before midnight. Prior to her death, O'Meara spoke with several friends about her relationship with appellant. She told one of them that "she couldn't take [her relationship with appellant] anymore, it was getting real crazy" and that she was going to take the girls and leave or ask him to leave. She told two other friends separately that she planned to leave appellant.

Appellant testified that the killing of his wife occurred during a fit of anger after his discovery that she had murdered his daughter. He said that he had previously told O'Meara he planned to leave her. He testified that he had gone to bed at about 10:30 p.m. that evening but was awakened when O'Meara came home from work and wanted to talk about his leaving and taking his paycheck. He said he did not want to talk and went back to sleep. When appellant was awakened a second time by O'Meara, who he said was upset about his threat to leave, she told him that he did not have to worry about paying child support. Appellant said he became concerned about the welfare of his three year old daughter, and when he checked on her, he was horrified and enraged to find her dead. Appellant said that when he returned to the bedroom he encountered O'Meara with a weight bar in her hand; a struggle ensued and appellant began hitting his wife with the weight bar. He stated that he wanted to kill her, and that he hated her guts. He did not remember how many times he hit her but remembered blood was everywhere. After killing his wife he then ran to his step-daughter's room to check on her, but when she was not there he assumed that she had gone to stay with a friend.

Appellant testified that he was afraid and confused, but decided to leave, and that he discovered his step-daughter after he showered and went to the basement to get some clothes. Appellant testified that he did not call police because he did not know what to tell them and did not think that they would believe that he was not responsible for the deaths. However, appellant admitted that he called his wife's employer before 6:00 a.m. on the morning of the July 17th to report that she was sick and would not be coming to work. Appellant also called his workplace at about 7:45 a.m., to say that he would be late. He then drove O'Meara's car to work arriving at about 8:15 a.m. Appellant left work after receiving his payroll check, and leaving a note for his supervisor which stated "I quit, Dale." His supervisor had no idea that he intended to quit. Appellant went directly to the bank to cash his check, and was the bank's first customer that morning at 9:00 a.m. Appellant then went to a bar in Minneapolis, arriving at about 1:00 or 2:00 p.m., and did not remember going to Wisconsin or being picked up by the police.

Appellant's former wife testified at trial that in March of 1985, while they were married but after she had separated from him, appellant came to her home at around 1:00 a.m. and assaulted her. During the assault appellant stated that he would rather see her dead than with someone else. A year later, appellant broke down her door in the middle of the night, assaulted her and told her that she could not kick him out of his own home, and that he was there to stay. The state introduced certified copies of appellant's convictions for fifth degree battery in connection with this incident.

At the close of evidence, the trial court dismissed Count IV of the indictment, murder while committing sexual assault, and the jury found appellant guilty of second degree murder of his wife and first-degree murder of his daughter and stepdaughter.

Appellant first contends that the evidence was insufficient to support Count IV of the indictment and that dismissal of the charge at the close of evidence did not cure the prejudice created by the introduction of evidence on this charge. Minn.R.Crim.P. 18.06, subd. 2 provides that the "grand jury may find an indictment when upon all of the evidence there is probable cause to believe

that an offense has been committed and the defendant committed it." Further,

> [t]he grand jury proceeding is not a mini-trial on the merits. The jurors do not determine guilt or innocence but rather determine if there is probable cause to believe that the accused has committed a crime.

*State v. Inthavong,* 402 N.W.2d 799 (Minn. 1987). The test of probable cause "is whether the evidence worthy of consideration * * * brings the charge against the prisoner within reasonable probability." *State v. Florence,* 239 N.W.2d 892, 896 (Minn.1976) (quoting *State ex rel. Hastings v. Bailey,* 263 Minn. 261, 266, 116 N.W.2d 548, 551 (1962)).

■■■ Also, "[a] presumption of regularity attaches to a grand jury indictment, and it is a rare case where an indictment will be invalidated." *Marhoun v. State,* 451 N.W.2d 323, 327 (Minn.1990). Thus, the accused bears a heavy burden when seeking to overturn an indictment, especially where the challenge is brought after appellant has been found guilty beyond a reasonable doubt following a fair trial. *State v. Scruggs,* 421 N.W.2d 707, 717 (Minn.1988). In *Scruggs* this court stated that a pretrial appeal is a more appropriate method of challenging an indictment than an appeal after a trial on the merits. *Id.*

■■■ Prior to trial, appellant moved to dismiss all counts of the indictment, alleging the evidence presented to the grand jury was insufficient to support the indictment. The trial court denied appellant's motion, holding that the totality of the evidence presented to the grand jury warranted an inference that the crimes of premeditated murder and first degree murder in connection with a sexual assault were committed. The defense did not appeal this ruling, but proceeded to trial on the merits.

Based upon the standards identified in our cases, we conclude that the state presented sufficient evidence to establish probable cause to indict appellant on the charge of murder while committing criminal sexual assault in connection with the death of his stepdaughter. Grand jurors heard testimony from a doctor who listed circumstances such as the location, clothing and position of the girl's body which suggested the occurrence of a sexual assault. They were told that she was not found in her bed (as was the three year old), but in the basement where appellant's co-worker testified he told her he had been sleeping. They were also told that her ankles had been bound, that her hands were bound behind her back, and that her swim suit had been pulled down to expose her breasts before her hands had been bound.

Further, the doctor stated that while sperm were not present, sperm disappear after 24 hours. The body had not been found for over 36 hours after the probable time of death. Although there were no tears or lacerations to the girl's vagina or anus, they were red and the anus was too large for a child of that age. Finally, the level of acid phosphate in the girl's mouth was inconsistent with that found elsewhere on the body, and was highly suggestive of a semen deposit. The doctor testified that while she could not be certain that a sexual assault had occurred, "everything taken together suggests strongly that it had." Based on all of the evidence presented to the grand jury, we conclude that the state met its burden of establishing probable cause.

■■■ Moreover, the decision by the trial court to dismiss this count of the indictment after the close of evidence does not mean that its earlier decision not to dismiss was erroneous. The court dismissed the charge only after hearing testimony from a doctor testifying for the defense who raised inferences contrary to those raised by the state's doctor. "Convictions based on circumstantial evidence will be sustained only when the reasonable inferences from such evidence are consistent with defendant's guilt and inconsistent with any rational hypothesis except that of guilt." *State v. Drieman,* 457 N.W.2d 703, 711 (Minn.1990). The raising of an equal and offsetting hypothesis in this case led the trial court to dismiss the charge.

■■■ Finally, it is not really the trial court's failure to initially dismiss this count which is the gravamen of appellant's complaint on this issue. Rather he contends that the mere admission of evidence on this charge, even though the count did not go to

the jury, denied him a fair trial because the evidence, suggesting a sexual assault on a child, was prejudicial by its very nature. "Where there is any reasonable doubt that the erroneously admitted evidence contributed to the verdict, a new trial must be granted." *State v. Johnson,* 294 N.W.2d 848, 849 (Minn.1980). However,

> [a] defendant claiming error in the trial court's reception of evidence has the burden of showing both the error and the prejudice resulting from the error * * *. A reversal is warranted only when the error substantially influences the jury to convict.

*State v. Loebach,* 310 N.W.2d 58, 64 (Minn. 1981) (citations omitted). Here there was no error in the admission of the evidence because the grand jury properly found probable cause to indict appellant. Further, much of this evidence would have been admitted even if this count of the indictment had been dismissed prior to trial. The jury still would have heard that appellant's step-daughter was found bound hand and foot in a partially removed swimming suit in the basement on a sleeping bag that appellant had been using as a bed. Thus, since at the time the evidence was admitted there was no error in its admission and since it cannot be said to have improperly influenced the jury to convict, no new trial is warranted on this issue.

 Appellant next contends that the evidence was insufficient to sustain the jury's verdicts on first and second degree murder. As noted earlier, appellant admitted the killing of his wife, but denied that he killed the two children. The standard of review for claims of insufficiency of the evidence is well established:

> Where there is a challenge to the sufficiency of the evidence, our review on appeal is limited to a painstaking analysis of the record to determine whether the evidence, when viewed in a light most favorable to the conviction, was sufficient to permit the jurors to reach the verdict which they did.

*State v. Webb,* 440 N.W.2d 426, 430 (Minn. 1989). A verdict will not be disturbed "if the jury, acting with due regard for the presumption of innocence and for the necessity of overcoming it by proof beyond a reasonable doubt, could reasonably conclude that a defendant was proven guilty of the offense charged." *State v. Alton,* 432 N.W.2d 754, 756 (Minn.1988). The reviewing court must view the evidence in the light most favorable to the prosecution and assume the jury believed the state's witnesses and disbelieved any evidence to the contrary. *State v. Bias,* 419 N.W.2d 480, 484 (Minn.1988).

 However, in this case the evidence connecting appellant to the deaths of the children is entirely circumstantial. In reviewing a challenge to the sufficiency of the evidence, "[a] conviction based on circumstantial evidence merits stricter scrutiny." *State v. Bias,* 419 N.W.2d at 484.

> Circumstantial evidence in a criminal case is entitled to as much weight as any other kind of evidence so long as the circumstances proved are consistent with the hypothesis that the accused is guilty and inconsistent with any rational hypothesis except for that of guilt.

*State v. Pilcher,* 472 N.W.2d 327, 335 (Minn. 1991). The conviction may stand only where the circumstances form "a complete chain which, in light of the evidence as a whole, leads so directly to the guilt of the accused as to exclude, beyond a reasonable doubt, any reasonable inference other than that of guilt." *Bias,* 419 N.W.2d at 484 (quoting *State v. Wahlberg,* 296 N.W.2d 408, 411 (Minn.1980)).

Even in light of this more stringent standard, we believe that the jury could have reasonably concluded that the evidence presented by the state was inconsistent with any hypothesis other than appellant's guilt of the murder of his wife and children. Evidence presented at trial placed the appellant alone with the children on the night they were murdered, and established that he had access to the tape and rope which bound them. Further, a fingerprint ridge on the tape roll found in the living room, while not conclusively identifying appellant, was consistent with his fingerprints. Evidence of his efforts to evade detection also bear on the issue: he closed up the house in the middle of the summer, pulled curtains and covered basement windows with blankets; he called to say

that his wife would not be coming to work; he cashed his paycheck and quit his job, and he fled the state.

We also note that there is little or no evidence which supports appellant's contention that his wife killed the children. Virtually the only support for this version of events is appellant's own testimony. The jury is, of course, free to question a defendant's credibility, and has no obligation to believe a defendant's story. *State v. Bliss,* 457 N.W.2d 385, 390 (Minn.1990). "[I]t is well-settled in Minnesota that it is the province of the jury to determine the credibility and weight to be given to the testimony of any individual witness." *State v. Engholm,* 290 N.W.2d 780, 784 (Minn.1980); *see also Bliss,* 457 N.W.2d at 390. The jury in this case had the opportunity to hear the appellant's testimony and to determine its weight and credibility. The jury after hearing all the evidence disbelieved appellant's version of events, and convicted him of the murders of his daughter and stepdaughter. The evidence presented to the jury was sufficient to sustain the convictions.

■ Finally, to the extent that appellant argues that the evidence was not sufficient to establish that the admitted murder of his wife was intentional, we conclude otherwise. On this issue, the medical evidence alone appears to be dispositive. Appellant's wife suffered 32 separate injuries from a metal weight bar and collar. The location and number of wounds evidenced an intent to kill. *See State v. Bryant,* 281 N.W.2d 712, 714 (Minn.1979).

■ Appellant next contends that he was denied a fair trial by the introduction of evidence of prior offenses during the state's case in chief. *See State v. Spreigl,* 272 Minn. 488, 139 N.W.2d 167 (1965). The trial court found that evidence of appellant's assaults on his former wife was admissible to show motive. The admission of evidence of prior crimes rests within the sound discretion of the trial court and a trial court's ruling will not be disturbed absent a clear abuse of discretion. *State v. Berry,* 484 N.W.2d 14, 17 (Minn.1992). Minn.R.Evid. 404(3)(b) provides that evidence of another crime is not admissible to prove "the character of a per-

son in order to show action in conformity therewith" but may be admissible for other purposes, such as proof of motive, intent, or identity. When it is unclear whether *Spreigl* evidence is admissible, the accused is to be given the benefit of the doubt. *State v. Rainer,* 411 N.W.2d 490 at 497 (Minn.1987).

Appellant's crimes against his former wife demonstrated a violent response to her efforts to end the relationship with him. Here, as well, the motive for his violent behavior appears to have been a reaction to the potential failure of his marriage. In this respect, this case is similar to *Rainer* where evidence of five assaults by defendant on his former wives was admitted after the defendant claimed that the shooting death of his girlfriend was accidental. This court held that past violence toward significant women in defendant's life showed "a repeating pattern of very similar conduct not merely a general propensity toward violence." *Id* at 497. The admission of *Spreigl* evidence in this case shows a similar pattern of violence against significant women in appellant's life. We conclude that in this case, the relevance of the prior crime evidence was established.

■ In addition to relevance, to admit *Spreigl* evidence the trial court must find that there is:

> clear and convincing [evidence] that defendant participated in the *Spreigl* offense, * * * and that the probative value of the *Spreigl* evidence is not outweighed by its potential for unfair prejudice.

*State v. DeWald,* 464 N.W.2d 500, 503 (Minn. 1991). Certified copies of appellant's two convictions for fifth degree assault were introduced into evidence providing clear and convincing evidence that he participated in the prior crimes. Finally the *Spreigl* evidence was more probative then prejudicial. The trial court properly noted that the *Spreigl* evidence was not so heinous that it would unfairly prejudice the jury.

In addition, the proper procedural safeguards required for the admission of *Spreigl* evidence were followed in this case. *See State v. Drieman,* 457 N.W.2d 703, 710 (Minn.1990). Notice was given prior to trial that the state intended to introduce *Spreigl*

 

evidence. The trial court ruled that the state's case was weak, and thus, the disputed evidence was necessary to the state's case. Finally, the trial court provided a cautionary jury instruction on the *Spreigl* evidence after appellant's ex-wife testified and in final instructions at the close of trial. The trial court followed necessary procedures, evaluated the evidence appropriately and did not abuse its discretion in admitting the *Spreigl* evidence.

Finally, appellant contends that he was denied a fair trial because the trial court admitted hearsay statements by appellant's wife that she intended to leave appellant, under the state of mind exception to the hearsay rule. Appellant contends that this evidence was not relevant to any issues raised at the trial and was therefore unduly prejudicial. "Rulings on evidentiary matters rest within the sound discretion of the trial court" and such rulings will be sustained unless a clear abuse of discretion is shown. *State v. Flores,* 418 N.W.2d 150, 158–9 (Minn. 1988). Minnesota Rules of Evidence Rule 803(3) provides that a "statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health)" is not excluded by the hearsay rule.

The admission of this type of evidence for the purpose of showing motive and the history of the relationship with the victim is well established. *State v. Langley,* 354 N.W.2d 389, 397 (Minn.1984). In fact, evidence pertaining to the relationship between a defendant and the homicide victim is ordinarily admissible in criminal prosecutions even where it references another crime. *State v. Salas,* 306 N.W.2d 832, 836 (Minn.1981). The state of mind evidence offered in this case was for this exact purpose, to show motive and the history of the relationship. The trial court did not abuse its discretion in admitting the state of mind evidence.

We have also considered the issues raised in appellant's pro se brief and find them to be without merit.

The conviction of appellant on one count of second-degree murder and two counts of first degree murder is affirmed.