HENNEPIN COUNTY, State of
Minnesota, Respondent,

v.

Leon PERRY, Appellant.

No. C0–96–112.

Supreme Court of Minnesota.

March 13, 1997.

John M. Stuart, Minnesota State Public Defender by Marie L. Wolf, Assistant State Public Defender, Minneapolis, for Appellant.

Hubert H. Humphrey, III, State Attorney General, St. Paul, Michael O. Freeman, Hen-

nepin County Attorney, Paul R. Scoggin, Donna J. Wolfson, Assistant County Attorneys, Jean E. Burdorf, Special Assistant County Attorney, Minneapolis, for Respondent.

## OPINION

PAGE, Justice.

Leon Perry (Perry) was indicted by a Hennepin County grand jury for, and was convicted by a Hennepin County jury of, first-degree murder under Minn.Stat. § 609.185, subd. 1 (1996), as a result of the shooting death of Brian Thomas (Thomas) in the parking lot of the Riverview Supper Club in Minneapolis, Minnesota, on July 8, 1995. Perry was sentenced to a term of life in prison. In a pretrial motion, Perry sought to have the indictment dismissed because of the racial composition of the grand jury which indicted him. Although 13.3% of the people in the initial pool of grand jurors were people of color, there were no people of color selected to serve on the grand jury which ultimately indicted Perry. The trial court denied the motion because Perry failed to show that people of color were systematically excluded during the grand jury selection process. On appeal, Perry raises two issues: (1) whether the trial court committed reversible error by allowing in evidence the out-of-court statement "Leon said he did the dude"; and (2) whether his conviction must be reversed because there were no minorities on the grand jury that indicted him. We affirm.

On July 8, 1995, Thomas, Andre Amos, and two women went to the Riverview Supper Club around 1 a.m. after a concert at the Cabooze bar. Amos testified that Thomas had a handgun under the seat of his car which he left in the car because the Riverview had a metal detector at the front door. According to Amos, Thomas had started carrying the gun two to three weeks earlier because he had been badly beaten up by some men at the Riverview. Amos testified that after they entered the club, Thomas, appearing upset, grabbed Amos and said that the same men who had beaten him up before were there. Amos told Thomas that they should leave and that he would try to find some of his friends so it would be safer. When he returned about ten minutes later to the place Thomas had been waiting, Thomas was gone.

At trial, Perry admitted shooting Thomas, but claimed that he shot him in self-defense. Perry claimed that Thomas was a dangerous person [1] who always carried a gun. According to Perry, he was dancing at the Riverview during the early hours of July 8th when McFadden told him that the guy who had beaten him up, Thomas, was there. McFadden told Perry that he was going to leave because he did not want any trouble. Perry and McFadden departed with a group of friends, including Chris Atkins, Preston Poole, LaVelle Oats, and two young women. Perry testified that when he got outside, Thomas was standing outside by the door of the club, glaring at everybody, and that Thomas made a motion like he was going to pull out a gun. According to Atkins, he saw Thomas standing by the door, making the same motion. Upon seeing Thomas make that motion, Perry said, "He got a gun" and everybody scattered. Perry then started walking the two young women to their cars. While doing so, Oats called him back and handed him a gun, which Perry put in the small of his back. After leaving the women at their cars, Perry walked back toward the club through a dark area, lit only by street lights surrounding the parking lot. As Perry walked back to the club, he noticed a black two-door Acura, parked with its interior light

1. This claim was, at least in part, based on Perry's understanding of Thomas' relationship with his second cousin, Theresa Anderson. Thomas was the father of one of Anderson's children. On May 14, 1995, at the home of Anderson's niece, Thomas got into an argument and retrieved a gun from the trunk of his car, but did not use it. On May 23, 1995, Thomas allegedly choked Anderson during an argument and later vandalized her car. Subsequently, Thomas began harassing Anderson by calling her daily and threatening her and her children. Perry was aware of these incidents involving Thomas and Anderson and had also heard that Thomas always carried a gun. Perry's claim was also based on an incident in which his uncle, Michael McFadden, alleged that Thomas had beaten him up and fired gunshots at his car.

on, with Thomas inside pointing his hand out the driver's side front window at Perry. Perry could not tell whether the driver's side window was up or down, but he testified that Thomas' body, except for his hand, was inside the car. Perry also could not tell if anything was in Thomas' hand; but he assumed that Thomas had a gun, was aiming it at him, and was going to shoot him. Perry kept walking, and as he got closer to the Acura, Thomas' hand started following him. When Perry testified that when he was parallel to the driver's door, Thomas' hand was still trained on him and, from a distance of 12 to 15 feet, Perry took out his gun, shot at Thomas' car, and started to run away.

As it turned out, an off-duty Minneapolis police officer, Eric Lukes,[2] witnessed the shooting. Officer Lukes was standing in the entryway to the club at about 1:45 a.m. when he saw Perry, about 50 yards away, shooting into the driver's side window of a car. According to Officer Lukes, Perry was standing about 1 foot away from the driver's side window. Officer Lukes did not see the gun in Perry's hand, but saw flashes from the gunshots. Officer Lukes immediately began chasing Perry and, during the chase, fired shots at Perry, saw Perry discard his gun under a car, and saw him dive into the back seat of a blue Chrysler LeBaron convertible occupied by McFadden, Poole, and Perry's brother, Kelvin Coppage. Officer Lukes never lost sight of Perry during the chase. With his gun still drawn, Officer Lukes ordered all of the car's occupants to get out and lie on the ground. When assistance arrived, Perry was placed in the back of one police car and McFadden, Poole, and Coppage were placed in the back of another.

Officers Rud and Olson received a call at approximately 1:55 a.m., informing them that there had been a shooting at the Riverview. When they arrived a few minutes later, they were directed to Thomas' car, where they found the car's driver's side window shattered and Thomas lying dead across the front seat with his head resting against the passenger door. None of the car's lights were on.

Four spent .45 caliber shell casings were found at the scene, including two that came to rest at the base of the car's windshield. During a search of the parking lot, a .45 caliber handgun was found underneath a car in the general area where Officer Lukes had seen Perry discard his gun. The hollow point .45 caliber bullets that killed Thomas were consistent with the bullets found in the gun Perry discarded in the parking lot. A folding buck knife was found on the floor of Thomas' car near the center console, and a loaded .25 caliber automatic pistol with the safety on was found in the waistband of Thomas' pants.

According to Dr. Peterson, the Hennepin County Medical Examiner, Thomas was struck by two bullets. One entered his left earlobe and struck his spinal cord and brain stem. Thomas would have died almost immediately from the wounds caused by this bullet. The other bullet struck the back of Thomas' left shoulder blade and lodged in soft muscle tissue. Dr. Peterson testified that he could not state for certain which wound occurred first, nor could he determine how far away the gun was when the bullets were fired.

Perry was interviewed at the police station at about 5:15 a.m. on July 8 by Sergeant Rorvick. Unknown to Perry, the interview was being audio- and video-taped. During the interview, Perry initially denied any involvement in the shooting, but Sergeant Rorvick told Perry he was confident Perry was the shooter. Sergeant Rorvick then left the room. While Sergeant Rorvick was out of the room, the videotape shows Perry examining and smelling his right hand. Sergeant Rorvick testified that he thought Perry was examining and smelling his hand for gunpowder residue and odor. Sergeant Rorvick, along with Sergeant Gerlicher, reentered the interview room, and Gerlicher confronted Perry, telling him that they knew he had shot Thomas and that they had eyewitnesses. They played an audiotape for Perry that had recorded the conversation between McFadden, Poole, and Coppage while they were

2. Officer Lukes worked part-time at the Riverview as a security officer, but was not working that night.

sitting in the police car after Perry's capture. On the tape, one of the three said, "Leon said he did the dude." At trial, Perry denied that he told McFadden, Poole, and Coppage that he killed Thomas. He claims that while all four of them were lying on the ground after being apprehended by Officer Lukes, he told McFadden, Poole, and Coppage that something had just happened and he was going to jail.

The first issue we address is whether Perry is entitled to a new trial because the trial court committed reversible error by allowing into evidence the statement that "Leon said he did the dude." Rulings on evidentiary matters rest within the sound discretion of the trial court. Minn.R.Evid. 104(a). Accordingly, we will not reverse a trial court's evidentiary ruling absent a clear abuse of discretion. *State v. Ture,* 353 N.W.2d 502, 515 (Minn.1984). On appeal, the defendant has the burden of proving that the trial court abused its discretion in admitting evidence and that he or she was thereby prejudiced. *State v. Steinbuch,* 514 N.W.2d 793, 799 (Minn.1994). Reversal is warranted only when the error substantially influences the jury's decision. *Id.*

The testimony leading up to the admission of the statement began with defense counsel's cross-examination of Sergeant Gerlicher. Defense counsel established that Sergeant Gerlicher was wrong when he confronted Perry during Perry's interview with the fact that there was more than one eyewitness to the shooting. On redirect, the prosecution clarified that Sergeant Gerlicher meant that the police had more than one witness *implicating* Perry in the shooting, rather than actually seeing him do the shooting. On recross, Sergeant Gerlicher explained the basis for his belief that more than one witness implicated Perry in the shooting:

Q. Sir, when you say witnesses implicated him in the shooting as of 5:15 a.m. that day, what witness other than Officer Lukes implicated him in the shooting?

A. I guess you would have to look at—define the word implicate. There was witnesses that gave statements to the effect as that he hadn't necessarily been standing in a parking lot as originally said. There was not witnesses as maybe you are suggesting that stood there and pointed and said that's the man that shot this person, so in that, you are correct, yes.

On further redirect, Sergeant Gerlicher testified that there was a hidden taperecorder in the police car holding McFadden, Poole, and Coppage that recorded their conversation while in the car. The trial court sustained all of defense counsel's hearsay objections to Sergeant Gerlicher's attempts to testify about the contents of that conversation. Ultimately, the prosecution was permitted to ask Gerlicher: "Sergeant, based on what you heard on that tape was it your opinion that the witnesses who were recorded on the tape implicated the defendant in the shooting?" and Sergeant Gerlicher answered "yes."

During Sergeant Rorvick's testimony, the state offered the videotape of Perry's interview into evidence. Defense counsel objected to admission of the videotape, arguing that it was cumulative and irrelevant. That objection was overruled. No hearsay or confrontation clause objection was made. Sergeant Rorvick was then questioned about Perry's interview. During this questioning, Sergeant Rorvick testified that, on the transcript from the videotape, Sergeant Gerlicher made a statement to Perry that someone on the audiotape said, "Leon said he did the dude."[3] There was no objection to this testimony or to the admission of the transcript of the videotape into evidence.

3. Perry had denied being the shooter during his interview and Sergeant Gerlicher confronted him with the audiotape recorded in the squad car containing McFadden, Poole, and Coppage. The transcript of the videotape reads, in relevant part:

Sergeant Rorvick: Leon, we know that isn't the truth because we did tape record them talking in the car about what you told them, okay?

Perry: What I told them?

Sergeant Gerlicher: Listen to this, listen to this. (Inaudible.)

[Tape is being played.]

Sergeant Gerlicher: "Leon said he did the dude."

Perry concedes that confronting him with the audiotape during the police interview was "perhaps a legitimate investigative technique" because, at the time of the interview, he had denied any connection with the shooting. However, Perry argues that the statement "Leon said he did the dude" was hearsay, highly prejudicial to his self-defense claim because it implies premeditation and planning, and that its admission was reversible error. Perry further contends that the error was not harmless because of "the closeness of the premeditation issue" and because the trial court did not provide a limiting instruction. Perry also asserts that the statement on the audiotape may not have been accurate.

■ Minnesota Rule of Evidence 801(c) defines "hearsay" as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Here, the statement was elicited to rebut defense counsel's suggestion that Sergeants Rorvick and Gerlicher had lied to Perry during his interview. Defense counsel, by suggesting that police lied to Perry about the evidence implicating him in the shooting, opened the door for the prosecution to inquire about the basis for Sergeants Rorvick and Gerlicher's belief that more than one witness implicated Perry in the shooting. Thus, the state was entitled to show that the police had a reasonable basis to believe that they were not lying to Perry when they told him that they had more than one witness implicating him in the shooting. The statement was also properly admitted to show that the police believed that Perry was lying when he denied being the shooter. *See, e.g., State v. Hanley,* 363 N.W.2d 735, 740 (Minn. 1985) (finding declarant's statement not hearsay because it was not offered to prove the truth of the matter stated but rather to show that he lied to the police). We conclude that the statement as admitted into evidence at trial was not hearsay.

Relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice." Minn. R.Evid. 403. The statement "Leon said he did the dude," while implicating Perry in Thomas' shooting, is otherwise neutral and is not unduly prejudicial. Therefore, we conclude that the statement's probative value was not outweighed by the danger of unfair prejudice.

Perry also argues that he is entitled to a new trial because his right to confront witnesses against him under the Sixth Amendment to the United States Constitution was violated by admission of the statement "Leon said he did the dude." The Sixth Amendment provides that, "In all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him * * *." U.S. Const. amend. VI. Perry's Sixth Amendment argument fails because before the Confrontation Clause is implicated, the statement in question must constitute hearsay. *See United States v. Norquay,* 987 F.2d 475, 481 (8th Cir.1993) (rejecting defendant's Confrontation Clause argument because the disputed testimony was not hearsay). As admitted into evidence in this case, the statement "Leon said he did the dude" did not constitute hearsay, thus, its admission was not error.

We conclude that the trial court did not abuse its discretion in admitting the statement "Leon said he did the dude" because: (1) the statement was not hearsay, was not unduly prejudicial, and was relevant; and (2) admission of the statement did not violate Perry's right to confrontation under the Sixth Amendment.

Finally, Perry argues that if his trial counsel did open the door for admission of the statement "Leon said he did the dude," then, to the extent that the inevitable outcome of that choice was admission of harmful evidence, doing so constituted ineffective assistance of counsel. The trial court denied Perry's motion for a mistrial on that ground.

■ A defendant making a claim of ineffective assistance of counsel bears the heavy burden of showing that: (1) counsel's performance was deficient and fell below an objective standard of reasonableness; and (2) petitioner was prejudiced by counsel's representation; that is, there was a reasonable probability that *but for* counsel's error, the

outcome would have been different. *Strickland v. Washington,* 466 U.S. 668, 687–88, 694, 104 S.Ct. 2052, 2064–65, 80 L.Ed.2d 674 (1984); *State v. Ecker,* 524 N.W.2d 712, 718 (Minn.1994). In order to obtain relief, a defendant must satisfy both prongs of the *Strickland* test. *Gates v. State,* 398 N.W.2d 558, 562 n. 1 (Minn.1987) (citing *Strickland,* 466 U.S. at 697, 104 S.Ct. at 2069–70). Failure to satisfy either prong will result in a denial of relief. *Id.*

Perry clearly fails to meet either prong of the *Strickland* test. The record does not suggest that Perry's trial counsel's performance fell below an objective standard of reasonableness. In fact, Perry admits that his trial counsel's intended strategy was valid, but that it produced an undesirable outcome. The fact that Perry's trial counsel asserted that he was ineffective if he "opened the door" is not enough to establish that his trial strategy was invalid or that his performance fell below an objective standard of reasonableness.

Moreover, even if we were to assume that Perry's trial counsel's performance was legally deficient, Perry has not shown that the outcome of his trial would have been different *but for* his trial counsel's mistake. Indeed, Perry concedes that the jury had "a great deal of reliable evidence to sift through" such as Officer Lukes' testimony, the forensic reports, and testimony about the relationship between Thomas and members of Perry's family. Perry has failed to provide any basis, other than his bald assertion, for concluding that the outcome of his trial would have been different had the statement not been admitted. Perry's bald assertion is not enough to meet the second prong of the *Strickland* standard.

We next address the issue of whether Perry's conviction must be reversed because there were no minorities on the grand jury that indicted him. A grand jury is comprised of not more than 23, nor less than 16, persons. Minn.R.Crim.P. 18.03; Minn.Stat. § 628.41, subd. 1 (1996). Grand jurors are to be "selected at random from a fair cross-section of the residents of the county who are qualified by law to serve as jurors and shall otherwise be selected as provided by law." Minn.R.Crim.P. 18.01, subd. 2. *See also* Minn.Stat. § 628.41, subd. 1; Jury Management Rules 801 and 805. Minnesota Jury Management Rule 809 prohibits a citizen from being excluded from jury service on account of, among other things, race or color.

Under Minnesota Jury Management Rule 804, the jury commissioner develops and implements a written plan for the administration of the jury system. In Hennepin County, grand jury members are summoned from a source list compiled from the county voter registration list, drivers' license list, motor vehicle registration list, and state identification card list. The grand jury that indicted Perry was selected as follows: 125 prospective grand jurors randomly selected from the source list were mailed a summons. The names of these individuals are placed on a list in the order selected. From that list of prospective grand jurors, 12 summonses were undeliverable and 30 individuals were disqualified.[4] From the remaining individuals on the list, the first 23 were sworn in as grand jurors and the next 6 were selected as alternates, and 54 were excused. The race of 98 of the 125 prospective grand jurors was known and, of that 98, 13,[5] or approximately 13.3%, were people of color. However, no people of color were among the 23 individuals sworn in as grand jurors, and only 1 person of color was among the 6 individuals selected as alternates.

The Sixth Amendment requires that the pool from which a jury is drawn reflect a representative cross-section of the community. *Taylor v. Louisiana,* 419 U.S. 522, 527–28, 95 S.Ct. 692, 696–97, 42 L.Ed.2d 690 (1975). This fair cross-section of the community requirement is limited and does not guarantee a defendant a jury of a particular racial composition or one that mirrors the racial makeup of the community. *Id.* at

4. The record does not tell us why the 12 summonses were undeliverable or why the 30 prospective jurors were disqualified.

5. The record does not tell us how many of these people remained in the pool of prospective grand jurors after the undeliverable summonses and disqualified individuals were eliminated.

538, 95 S.Ct. at 701–02; *see also Holland v. Illinois,* 493 U.S. 474, 480, 483, 110 S.Ct. 803, 807, 808–09, 107 L.Ed.2d 905 (1990); *Cassell v. Texas,* 339 U.S. 282, 286–87, 70 S.Ct. 629, 631–32, 94 L.Ed. 839 (1950) ("Obviously the number of races and nationalities appearing in the ancestry of our citizens would make it impossible to meet a requirement of proportional representation."). To establish a prima facie showing that the jury venire from which a jury was selected did not satisfy the fair cross-section of the community requirement, a defendant must show: (1) that the group allegedly excluded is a "distinctive" group in the community; (2) that the group in question was not fairly represented in the venire; and (3) that the underrepresentation was a result of a systematic exclusion of the group in question from the jury selection process. *Duren v. Missouri,* 439 U.S. 357, 364, 99 S.Ct. 664, 668–69, 58 L.Ed.2d 579 (1979); *State v. Williams,* 525 N.W.2d 538, 542 (Minn.1994). The state may rebut a prima facie case by showing that aspects of the jury selection that produced the underrepresentation nonetheless advanced a significant state interest. *Id.* at 367–68, 99 S.Ct. at 670–71; *Williams,* 525 N.W.2d at 542.

Perry concedes that he cannot establish a prima facie case under *Duren* because he cannot identify a systematic exclusion of people of color in the selection of his grand jury. Further, Perry does not contend that the 125–person pool from which his grand jury was selected was not made up of a fair cross-section of the community. He does, however, argue that this court should invoke its supervisory powers to adopt a grand jury selection plan that would ensure that every Hennepin County grand jury has people of color represented in proportion to the percentage of people of color in Hennepin County's adult population. Specifically, Perry invites the court to mandate use of the grand jury selection plan proposed by the 1992 Report of the Hennepin County Attorney's Task Force that reviewed the racial composition of Hennepin County grand juries.[6]

The proposal recommended by the Hennepin County Attorney's Task Force raises serious constitutional questions, not the least of which is what is the compelling state interest that would justify the institution of a race-based selection process for

6. The Task Force was created, at least in part, because of "intense public interest in the grand jury's review of the death of Tycel Nelson," an African-American teenager shot and killed by a Minneapolis police officer. The Task Force was given the following charge:

> Review of the racial composition of past grand juries;
> Review of legal issues relating to the composition of grand juries in Minnesota, other states, and the federal courts; and
> Based on consideration of the factual background, legal issues and public policy concerns, recommend ways in which grand juries can be more representative of the racial diversity in Hennepin County.

The Task Force found that while racial minorities were overrepresented as victims, witnesses, and suspects appearing before grand juries in Hennepin County, they were underrepresented on Hennepin County grand juries. For example, in homicide cases presented to Hennepin County grand juries between the end of 1989 and March 1991, 66% of all victims and 71% of all suspects were members of racial or ethnic minorities, while at the same time, of the five grand juries selected between November 1989 and March 1991, Hennepin County's grand jury selection process produced three that were all white. Between March 1968 and March 1991, 26 of 66 grand juries were all white.

The Task Force made a number of recommendations to increase minority presence on the grand jury; however, the recommendation advocated by Perry is the proposal for modifying the grand jury selection process to guarantee at least two minorities on every grand jury in Hennepin County. Under this proposal, 21 of the grand jury's 23 members would be selected at random from a list of 55 people qualified to serve. If at least two of these 21 jurors are "minority persons," the last two grand jurors would also be selected randomly. If no minority persons or only one minority person was included in the initial group of 21, the last one or two grand jurors would be selected as follows: all nonminority persons remaining on the list would be bypassed and the first one or two minority persons would fill the remaining grand jury positions. If necessary, a second list of 55 people or a third or fourth list could be created to ensure the inclusion of at least two minority persons on the grand jury. The proposal does not attempt to match the races of the jurors and defendants, and it does not assure every minority defendant a jury containing members of his or her own race. According to the Task Force's report, requiring two persons of color on a 23–person grand jury would constitute representation proportional to the adult minority population in Hennepin County.

grand jurors in Hennepin County?[7] The facts of this case do not provide this court the opportunity to answer that question. Perry does not claim that people of color are systematically excluded from Hennepin County grand juries generally or that they were systematically excluded from the grand jury which indicted him. Further, our review of the record does not suggest or imply that race played an impermissible role in Perry's indictment, nor are there any facts in the record from which one might infer that race played an impermissible role in his indictment. Therefore, on the facts of this case, we decline Perry's invitation to mandate that the Hennepin County district courts implement the Task Force's proposal.[8] Our decision today should not be read as an indication that this court is backing away from the commitment set out in *State v. Williams* "to insure that the systems used [in jury selection] are increasingly inclusive in the hope that the faces of the people in the jury room will soon mirror the faces of the people in the community at large." 525 N.W.2d at 544. We have lost neither our commitment nor our resolve.

We affirm Leon Perry's conviction in all respects.

Affirmed.

BLATZ, J., took no part in the consideration or decision of this case.

PAGE, Justice (concurring specially).

Having authored the court's opinion in this case, I obviously agree with its conclusions and analysis. I take the unusual step of writing separately to voice concerns, resolution of which are not required by the particular facts and circumstances of this case, yet which I feel require some comment. My concerns are: (1) the fact that the Hennepin County District Court's grand jury selection process which, at least on its face, appears to be race neutral, also appears to be a system that nonetheless disproportionately excludes people of color from actually serving on grand juries; and (2) the unmet need to identify and provide constitutionally-permissible remedies to eliminate this disproportionate exclusion of people of color.

The intentional exclusion of people of color from service on Hennepin County's grand juries is not at issue in this case. Nor is the issue the fact that Hennepin County's race-neutral approach to grand jury selection results in some single-race grand juries. After all, "[t]he Sixth Amendment does not guarantee a criminal defendant a jury of a particular composition * * *." *State v. Williams*, 525 N.W.2d 538, 542 (Minn.1994) (citing *Taylor v. Louisiana*, 419 U.S. 522, 538, 95 S.Ct. 692, 701, 42 L.Ed.2d 690 (1975)). However, I do believe that there is a defect in the design of the Hennepin County selection system that produces a disproportionate number of single-race grand juries and, thus, has the same effect as if the exclusion of people of color was intentional. Invidious discrimination, whether intended or unintended, is devastating to the integrity of our justice system.

While, on its face, the process used by Hennepin County to select grand jurors appears to be race-neutral, it has, for some time, disproportionately[1] excluded people of color from participating in one of the most important and fundamental activities of our representative government. At some point, a purportedly race-neutral process that per-

7. Under strict scrutiny, a race-based selection process violates the Equal Protection Clause unless the measure is narrowly tailored and reasonably necessary to further a compelling governmental interest. *Adarand Constructors, Inc. v. Pena*, — U.S. —, —, 115 S.Ct. 2097, 2113, 132 L.Ed.2d 158 (1995).

8. We note that in October 1993, by court order, we granted permission to the Fourth Judicial District (Hennepin County) to implement the Task Force proposal on a trial basis; however, the county has not implemented the proposal to date.

1. Between 1968 and March 1991, 26 of 66 Hennepin County grand juries were all-white. More recently, between November of 1989 and March of 1991, 3 of 5 grand juries were all-white. The record does not reflect the racial make-up of grand juries selected after March 1991, nor does the record tell us whether people of color were proportionally represented, overrepresented, or underrepresented on any of the grand juries on which they did serve.

petuates and reinforces inequality of opportunity (in this case, the opportunity to in fact serve on a grand jury) is no different than a race-based process intended to produce the same result. In the end, no practical difference exists between a process that produces single-race grand juries by chance and one that produces single-race grand juries by design. There can be scant comfort for the people of color excluded from participation in our justice system's decision-making process in the knowledge that their exclusion was not the result of a systematic process and therefore not violative of either the United States or Minnesota Constitutions. Nor can there be much comfort for society at large in the knowledge that, as a result of disproportionate numbers of single-race grand juries, a large segment of our society mistrusts and has lost confidence and faith in the fairness of our justice system. Perpetuating unfairness, in the name of fairness, will not bridge the racial divide we face.

The Hennepin County Task Force proposal raises serious constitutional questions, the most fundamental being, "What is a compelling state interest?" that would justify a race-based grand jury selection process. While we do not need to answer that question to resolve this case, clearly, the current message from the United States Supreme Court seems to be that virtually nothing would justify a race-based selection process for grand jurors. My reading of the Court may or may not be accurate, but it cannot be denied that our citizens of color have a constitutional right to participate in our justice system and, I believe that the fact that people of color are disproportionately excluded from the opportunity to participate implicates a compelling state interest. "The jury is perhaps the most important instrument of justice. For jury service is the only avenue of direct participation in the administration of justice open to the ordinary citizen." *United States Commission on Civil Rights, Justice* 89 (1961). Our failure to include people of color in judicial decisions that affect their lives and communities offends the notion of justice. To the extent that the perception of justice legitimizes our justice system, maximizing that perception is in the justice system's best interest and having people of color represented on grand juries is essential toward that end.

The compelling interest in including people of color in the justice system's decision-making process is starkly illustrated by the reactions of communities of color when they feel that they have been excluded from the system. For example, the creation of the Hennepin County Attorney's Task Force was prompted by the outrage that occurred after a single-race grand jury refused to indict a white police officer who had shot and killed Tycel Nelson, a black teenager in Minneapolis. The "accuracy" of that grand jury's deliberations and decision was irrelevant when the grand jury itself was considered illegitimate. Further, violent reactions to perceived injustice are all too common, as demonstrated most recently in Los Angeles, Pittsburgh, Miami, and St. Petersburg. The riots that have taken place in those cities, while deplorable and unacceptable, illustrate the frustrations of a segment of our society that feels alienated from and excluded by the one branch of government whose singular purpose is the dispensation of fair and impartial justice. These riots are an all too clear reminder that, when otherwise law-abiding people feel that government has excluded and ignored them, they react with anger. Indeed, the United States Supreme Court, at one time, recognized that the "need for public confidence is especially high in cases involving race-related crimes. In such cases, emotions in the affected community will inevitably be heated and volatile. Public confidence in the integrity of the criminal system is essential for preserving community peace in trials involving race-related crimes." *Georgia v. McCollum,* 505 U.S. 42, 49, 112 S.Ct. 2348, 2354, 120 L.Ed.2d 33 (1992).

In voicing my concerns about the Hennepin County grand jury selection process, I understand that a defendant is not entitled to jurors who ascribe to a "minority view." However, the rationale, at least in part, behind having so many jurors serve on the grand jury is to ensure a diversity of views, thereby making its decision richer and more impartial. *Cf. Williams v. Florida,* 399 U.S. 78, 100, 90 S.Ct. 1893, 1905–06, 26 L.Ed.2d 446 (1970) (stating that the number of petit

jurors should "be large enough to promote group deliberation, free from outside attempts at intimidation, and to provide a fair possibility for obtaining a representative cross-section of the community."). The Sixth Amendment's requirement that a jury pool should be made up of people comprising a fair cross-section of the community is premised on the idea that "[o]ur notions of what a proper jury is have developed in harmony with our basic concepts of a democratic society and a representative government. For 'It is part of the established tradition in the use of juries as instruments of public justice that the jury be a body truly representative of the community' * * * and not the organ of any special group or class." *Glasser v. United States,* 315 U.S. 60, 85–86, 62 S.Ct. 457, 472, 86 L.Ed. 680 (1942) (quoting *Smith v. Texas,* 311 U.S. 128, 130, 61 S.Ct. 164, 165, 85 L.Ed. 84 (1940)). The goal of jury impartiality is best achieved through the widest possible range of views and experiences. While we should not seek to have particular views represented on a grand jury, in order to have a grand jury that is truly representative of the community, we should strive to have the benefit of all views.[2] When the views of people of color are disproportionately excluded, our justice system fails to reflect a true democratic process. This flaw must be addressed.

The United States Supreme Court has all but eliminated the government's ability to invoke race-based measures to rectify racial imbalances. Under its current equal protection strict scrutiny standard, the Court has articulated an extremely narrow set of circumstances where it would uphold race-based measures. Most recently, in *Adarand Constructors, Inc. v. Pena,* — U.S. ——, ——, 115 S.Ct. 2097, 2117, 132 L.Ed.2d 158 (1995), the Court cited as the only example[3] of a compelling interest the goal of correcting "pervasive, systematic, and obstinate discriminatory conduct." *See also Shaw v. Hunt,* — U.S. ——, ——, 116 S.Ct. 1894, 1902, 135 L.Ed.2d 207 (1996) (stating that remedying the effects of past or present racial discrimination may justify use of a racial classification); *Miller v. Johnson,* — U.S. ——, ——, 115 S.Ct. 2475, 2491, 132 L.Ed.2d 762 (1995) (insisting on "a strong basis in evidence of the harm being remedied" before justifying race-based remedies); *Shaw v. Reno,* 509 U.S. 630, 656, 113 S.Ct. 2816, 2831–32, 125 L.Ed.2d 511 (1993) (finding a "significant state interest in eradicating the effects of past racial discrimination"); *City of Richmond v. J.A. Croson Co.,* 488 U.S. 469, 505, 109 S.Ct. 706, 728, 102 L.Ed.2d 854 (1989) (holding that a compelling interest was not implicated when no evidence existed of identified discrimination in the city's construction industry). In taking this narrow approach, the Court embraces "equal opportunity" or "colorblindness" as the vehicle that will eradicate discrimination in our society. Obviously, equal opportunity is the goal that we seek to achieve, for if we had true equality of opportunity, we would not need to be concerned with equality of result. However, equal opportunity, while a valid and ideal construct, is at this stage only that—an ideal construct. That is, equal opportunity operates on the assumption that society is free of prejudice and discrimination. That is not, however, the reality in which we live. Relying on equal opportunity, which does not exist but which we seek to achieve, as the vehicle to eradicate racial discrimination,

2. The value of representative juries applies equally to white defendants.

> [W]e are unwilling to make the assumption that the exclusion of [minorities] has relevance only for issues involving race. When any large and identifiable segment of the community is excluded from jury service, the effect is to remove from the jury room qualities of human nature and varieties of human experience, the range of which is unknown and perhaps unknowable. It is not necessary to assume that the excluded group will consistently vote as a class in order to conclude, as we do, that its exclusion deprives the jury of a perspective on human events that may have unsuspected importance in any case * * *.

*Peters v. Kiff,* 407 U.S. 493, 503–04, 92 S.Ct. 2163, 2168–69, 33 L.Ed.2d 83 (1972).

3. The Supreme Court's exceedingly narrow view of situations that warrant race-based measures and its failure to give any guidance by clearly articulating measures that can be used to eliminate the racial unfairness plaguing our nation stifles the government's ability to remedy these problems. In addition, it has the pernicious effect of eroding the hopes and dashing the spirit of those who believe in equal rights for all.

which does exist, places the cart before the horse. Similarly, colorblindness is a philosophically appealing approach, but is in practice unrealistic because, although theoretically the law may be colorblind, the society we live in is not, nor, as our Racial Bias Task Force has told us, is Minnesota's justice system. As President Lyndon Johnson accurately stated in a 1965 commencement address at Howard University:

> You do not take a person who, for years, has been hobbled by chains and liberate him, bring him up to the starting line of a race and then say, "You are free to compete with all the others," and still justly believe that you have been completely fair.
>
> * * * * * *
>
> * * * We seek not just freedom but opportunity—not just legal equity but human ability—not just equality as a right and a theory, but equality as a fact * * *.

Terry Eastland & William J. Bennett, *Counting By Race: Equality from the Founding Fathers to* Bakke *and* Weber 6 (1979). Seeking to achieve a colorblind justice system should not mean that we settle for a system that is blind to the effects of invidious discrimination. Making discrimination harder to detect is not the same as making it go away.

"In order to get beyond racism, we must first take account of race * * * in order to treat some persons equally, we must treat them differently." *Regents of the Univ. of Cal. v. Bakke,* 438 U.S. 265, 407, 98 S.Ct. 2733, 2807, 57 L.Ed.2d 750 (1978) (Blackmun, J.). It was Justice Blackmun who anticipated and best summarized the current court's view on issues of race in his dissent in the 1989 case of *Wards Cove Packing Co., Inc. v. Atonio,* 490 U.S. 642, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989). While Justice Blackmun was specifically addressing the Court's approach to Title VII disparate impact analysis, his comments are equally appropriate here. "The majority's legal rulings essentially immunize these practices from attack under a Title VII disparate-impact analysis. Sadly, this comes as no surprise. One wonders whether the majority still believes that race discrimination—or, more accurately, race discrimination against nonwhites—is a problem in our society, or even remembers that it ever was." *Id.* at 662, 109 S.Ct. at 2127.

Ultimately, the question that must be answered, in light of the current Supreme Court's constraints on race-based remedial measures, is what measures may be taken that will increase the opportunity for people of color to participate in the democratic process by serving on grand juries and having their views considered and their voices heard. Unfortunately, the parties in this case, being focused on the question of whether we should implement the Hennepin County Attorney's Task Force proposal, have not provided much assistance. Thus, that question cannot be adequately answered on the record before us. Nor, at least at this time, am I convinced that the question should be answered by this court using its judicial decision-making authority. That question is more properly answered, and acted upon, by the court committee responsible for the General Rules of Practice for the District Courts. This is not to suggest that the issue needs more study. It does not. The committee should identify and implement those measures that it believes will actually have an impact on eliminating the disproportionate exclusion of people of color from serving on grand juries.

I believe there are some race-conscious, but not race-based, measures that can be taken which fit within the Supreme Court's constraints and, at the same time, will have the effect of reducing the disproportionate exclusion of people of color from grand juries. One such measure would be to allow the jury commissioner to oversample prospective jurors by city, neighborhood, or even zipcode in areas where people of color live in greater numbers. Another measure would be to modify the current selection process by giving the jury commissioner the ability to, at least once,[4] randomly reorder the list of prospective jurors when there are people of color included in the pool of eligible

4. Any requirement that random reordering of the list of prospective jurors continue until people of color are included on the list would more likely than not run afoul of the Supreme Court's prohibition against race-based remedial measures.

Based upon all the files, records and proceedings herein,

grand jurors, but none included in the first 23 individuals on the list. The latter suggestion, while not guaranteeing or mandating that the grand jury include people of color, would increase the likelihood of that result. These are just two measures that I believe would reduce the disproportionate exclusion of people of color from service on grand juries. With thoughtful creativity, other measures are waiting to be developed.

Our efforts to increase the number of people of color serving on grand juries will determine the future vitality of a criminal justice system inextricably linked to race. People of color must be included and must actually serve on grand juries if we are "to continue to progress as a multiracial democracy." *Edmonson v. Leesville Concrete Co., Inc.*, 500 U.S. 614, 630, 111 S.Ct. 2077, 2088, 114 L.Ed.2d 660 (1991). I believe it can be done.